# MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. *v.* WARE

No. 72–312.   Argued October 9–10, 1973—Decided December 4, 1973

118

BLACKMUN, J., delivered the opinion of the Court, in which all Members joined, except STEWART, J., who took no part in the decision of the case.

*William H. Orrick, Jr.,* argued the cause for petitioner. With him on the briefs was *W. Reece Bader.*

*Joseph C. Barton* argued the cause for respondent. With him on the brief was *Thomas E. Feeney.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the question whether certain rules of the New York Stock Exchange, promulgated as self-regulating measures pursuant to § 6 of the Securities Exchange Act of 1934, 48 Stat. 885, 15 U. S. C. § 78f, and a broker's employee's pledge to abide by those rules, preempt avenues of wage relief otherwise available to the employee under state law. The California Court of Appeal answered this in the negative. 24 Cal. App. 3d 35, 100 Cal. Rptr. 791 (1972). Because of the significance of the question in the area of federal-state relations, we granted certiorari. 410 U. S. 908 (1973).

## I

Respondent, David Ware, in July 1958 entered the employ of petitioner Merrill Lynch, Pierce, Fenner & Smith, Inc., a New York corporation, as a registered representative or "account executive" in the petitioner's San Francisco office. Ware worked there continuously until March 1969 when he voluntarily terminated that relationship and accepted a similar position in San Francisco with one of Merrill Lynch's competitors.

Merrill Lynch is a broker-dealer in securities and is a member-corporation of the New York Stock Exchange. Since prior to 1958, the firm has had a noncontributory Profit-Sharing Plan for its employees in the United States.

---

*Solicitor General Bork, Gerald P. Norton, David Ferber,* and *Richard E. Nathan* filed a brief for the United States as *amicus curiae* urging affirmance.

Under the Plan an employee may have allocated to his account both vested and unvested units, as therein described. Article 11 of the Plan relates to "Forfeiture of Benefits" upon the happening of specified events. One such event is competitive activity:

"11.1 A Participant who, in the determination of the Committee, voluntarily terminates his employment with the Corporation or provokes his termination and engages in an occupation which is, in the determination of the Committee, competitive with the Corporation, or any affiliate or subsidiary thereof, shall forfeit all rights to any benefits otherwise due or to become due from the Trust Fund with respect to units credited for fiscal years subsequent to the fiscal year ended December 30, 1960."

The Committee referred to is provided for by the Plan's Art. 1. It has not less than five nor more than nine persons (not necessarily employees) appointed by Merrill Lynch and serving "at the pleasure of the Corporation." Article 1.2 states that the Committee "shall administer the Plan" and "shall determine any questions arising in the administration, interpretation and application of the Plan, which determination shall be conclusive and binding on all persons."

At the time Ware terminated his employment with Merrill Lynch in March 1969, both vested and unvested units were allocated to his account. Upon his departure, the Committee, pursuant to Art. 11.1, determined that Ware, by entering competitive employment, had forfeited all rights to benefits due or to become due him under the Plan.

In January 1970 Ware filed this class action in California state court against Merrill Lynch and the members of the Committee. The class purported to consist of Ware and all other similarly situated former

Merrill Lynch employees in California. . Declaratory relief was sought to the effect that Art. 11.1 was "unlawful and void under applicable California law," and that the defendants were obligated to pay all vested units credited from December 30, 1960, to the date of termination of employment.

Although the statute was not cited in the complaint, the parties appear to agree that the suit rested principally on § 16600 of the California Business and Professions Code. This reads:

> "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

In its answer, Merrill Lynch alleged that the provisions of Art. 11.1 were a reasonable restraint on competition under the laws of New York or of the United States; that, pursuant to Art. 22.1[1] of the Plan, it was to be construed according to the laws of New York; that under New York law Art. 11.1 is lawful, valid, and enforceable; that a condition of Ware's employment with Merrill Lynch was approval by the New York Stock Exchange; that Ware, at the time of his employment in 1958, executed a written application, on an Exchange form, for approval of his employment as a registered representative, as required by the Exchange's Rule 345 (a)(1); [2] that by ¶ 30 (j) of that form Ware agreed that any controversy with a member arising out of the

---

[1] "22.1   The validity of the Plan or of any of the provisions thereof shall be determined under and shall be construed according to the laws of the State of New York."

[2] "Rule 345.   (a) No member or member organization shall

"(1) permit any person to perform regularly the duties customarily performed by a registered representative, unless such person shall have been registered with and is acceptable to the Exchange . . . ."

termination of his employment would be settled by arbitration at the instance of any party; [3] that the Exchange approved the application; that Ware's sole remedy was arbitration; and that a declaration that Art. 11.1 was invalid under the laws of California would cause Merrill Lynch to discriminate in the administration of the Plan and would deprive it of due process of law.

Merrill Lynch, invoking § 1281.2 of the California Code of Civil Procedure,[4] petitioned the state court for an

[3] Paragraph 30 (j) of the Exchange form reads:

"(j) I agree that any controversy between me and any . . . member organization arising out of my employment or the termination of my employment by and with such . . . member organization shall be settled by arbitration. at the instance of any such party in accordance with the Constitution and rules then obtaining of the New York Stock Exchange."

Paragraph 30 (d) of the same form reads in part:

"(d) I have read the Constitution and Rules of the Board of Governors of the New York Stock Exchange and, if approved, I hereby pledge myself to abide by the Constitution and Rules of the Board of Governors of the New York Stock Exchange as the same have been or shall be from time to time amended, and by all rules and regulations adopted pursuant to the Constitution, and by all practices of the Exchange."

Rule 347 (b) of the New York Stock Exchange, adopted in April 1958, prior to Ware's employment, provides:

"(b) Any controversy between a registered representative and any . . . member organization arising out of the employment or termination of employment of such registered representative by and with such . . . member organization shall be settled by arbitration, at the instance of any such party, in accordance with the arbitration procedure prescribed elsewhere in these rules."

It is thus apparent that ¶ 30 (j) of the form follows the language of the Exchange's Rule 347 (b).

[4] "§ 1281.2 Order to arbitrate controversy; petition; determination of court

"On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall

order directing arbitration pursuant to the above-quoted ¶ 30 (j) and Ware's pledge, contained in his application for approval of employment, that he would "abide by the Constitution and Rules of the Board of Governors of the New York Stock Exchange" and that he submitted himself "to the jurisdiction of such Exchange."

Ware opposed arbitration on the grounds that no contract to arbitrate existed between him and Merrill Lynch; that if an agreement to this effect existed, it was a contract of adhesion; and that, since § 16600 made the forfeiture provision illegal under California law, it was not arbitrable.

The state trial court, by minute order, denied the petition to compel arbitration.

Merrill Lynch then appealed. The California Court of Appeal held that a written agreement to arbitrate did exist; that the Exchange form was "a contractual agreement"; and that the "approval and registration by Merrill Lynch made the application a contract between the parties." 24 Cal. App. 3d, at 40–41, 100 Cal. Rptr., at 795–796. The court went on to hold, however, that the forfeiture clause was invalid and unenforceable under California law, when applied to California residents, as being in restraint of trade. *Id.*, at 42–43, 100 Cal. Rptr., at 796–797. Cited as supporting authorities were *Frame* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 20 Cal. App. 3d 668, 97 Cal. Rptr. 811 (1971), where the same forfeiture clause was held ineffective under California law, but where the court also held that an

---

order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that:

"(a) The right to compel arbitration has been waived by the petitioner; or

"(b) Grounds exist for the revocation of the agreement. . . ."

enforceable agreement to arbitrate existed,[5] and *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239, 398 P. 2d 147 (1965).

Finally, the Court of Appeal, while taking note of California's "strong public policy" favoring arbitration, .held that Merrill Lynch's contributions under its Profit-Sharing Plan were wages, within the meaning of §§ 200 [6]

---

[5] In *Frame*, decided only five months earlier, the same California Court of Appeal *reversed* a trial court's order *denying* arbitration and thus seemingly arrived at an ultimate result opposite to that reached in the present case. The court held, 20 Cal. App. 3d 668, 671–673, 97 Cal. Rptr. 811, 813–815, that Frame (like Ware) had made an agreement to arbitrate; that there was no basis for using the doctrine of adhesion to avoid arbitration; that the forfeiture provision of Art. 11.1 was ineffective under § 16600; that the agreement's provision that New York law was to apply "must not be allowed to defeat" the policy of § 16600; that, however, the entire contract was not necessarily unlawful; and that a

"latent question exists as to whether the agreements of the parties may be construed as applying only to such permissible subjects of restraint as breaches of confidence and misappropriation of trade secrets. Other questions may be raised as to the time and circumstances of respondent's employment and the amount of any benefits earned and remaining unpaid. All of these matters, whether they involve questions of law or questions of fact are in the first instance properly subject to arbitration." 20 Cal. App. 3d, at 673, 97 Cal. Rptr., at 815.

But no mention was made in *Frame* of §§ 200 and 229 of the State's Labor Code, see nn. 6–7, *infra*, and, as the court later said in this case, 24 Cal. App. 3d 35, 43, 100 Cal. Rptr. 791, 797, "[t]he *Frame* court did not consider the effect of section 229 of the Labor Code on the arbitration agreement." Apparently, neither side in *Frame* sought review by the California Supreme Court.

[6] "§ 200. Definitions

"As used in this article: (a) 'Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."

and 229 [7] of the California Labor Code, and that § 229 gave Ware "the right to bring his claim in court in spite of any agreement to arbitrate." 24 Cal. App. 3d, at 43–44, 100 Cal. Rptr., at 797–798. Merrill Lynch's petition for hearing by the Supreme Court of California was denied without opinion. See 24 Cal. App. 3d, at 45.

## II

The broad issue thus presented to us is the extent to which authority delegated under a federal regulatory statute pre-empts state law. Specifically, we are concerned with the questions (a) whether, in the context of the present case, § 229 of the California Labor Code, which would preclude compulsory arbitration of wage disputes, is ineffective under the Supremacy Clause; (b) whether § 16600 of the California Business and Professions Code unduly interferes with federal regulation of the securities industry; and (c) whether the California legislation unconstitutionally burdens interstate commerce.

In order to resolve these questions, we think it necessary to review the principles of stock exchange pre-emption delineated in this Court's decision a decade ago in *Silver* v. *New York Stock Exchange*, 373 U. S. 341 (1963), and to examine the geneses of the federal Act and of the California statute.

---

[7] "§ 229. Actions to enforce payment of wages; effect of arbitration agreements

"Actions to enforce the provisions of this article for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate. This section shall not apply to claims involving any dispute concerning the interpretation or application of any collective bargaining agreement containing such an arbitration agreement."

Section 229 was added to the Code in 1959. Cal. Stats. 1959, c. 1939, p. 4532.

A. In *Silver* the Court considered whether, and to what extent, the federal antitrust laws apply to securities exchanges regulated by the 1934 Act. It held that the mere passage of the Act did not effect, *pro tanto,* a repeal of the federal antitrust laws, but that particular instances of exchange regulation that fall within the scope and purposes of the Act may be justified and will be upheld against antitrust challenge. *Id.,* at 357–361. With respect to the specific question there presented, it was clear that the New York Stock Exchange had exercised its "tremendous economic power," *id.,* at 361, against two nonmembers by discontinuing their direct-wire telephone connections with members of the Exchange without notice, hearing, or statement of reasons. It was the Court's view, under the circumstances, that procedural guarantees were necessary in order to protect against the possibility of proscribed antitrust practices and to provide the "extremely beneficial effect in keeping exchange action from straying into areas wholly foreign to the purposes of the Securities Exchange Act." *Id.,* at 362. See also, *Ricci* v. *Chicago Mercantile Exchange,* 409 U. S. 289, 300–301 (1973).

In contrast with *Silver,* we are not confronted here with conflicting federal regulatory schemes. The present controversy concerns the interrelationship between statutes adopted, respectively, by the Federal Government and a State. The analytical framework of *Silver* is instructive, nonetheless. There the Court reviewed carefully the securities exchange regulatory scheme that Congress had adopted in order to identify the character and purposes of the Act and the extent to which instances of exchange self-regulation were necessary to the furtherance of congressional aims and objectives. 373 U. S., at 349–361. It was mindful, also, of the purposes behind the conflicting statutes which, in that case, were the

antitrust laws. So here, we may not overlook the body of law relating to the sensitive interrelationship between statutes adopted by the separate, yet coordinate, federal and state sovereignties. Our analysis is also to be tempered by the conviction that the proper approach is to reconcile "the operation of both statutory schemes with one another rather than holding one completely ousted." *Id.*, at 357.[8] The principle that emerged from *Silver*, and the premise upon which the Court based its judgment, was that conflicting law, absent repealing or exclusivity provisions, should be pre-empted by exchange self-regulation "only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act." *Id.*, at 361.

B. The Securities Exchange Act of 1934, as amended, 15 U. S. C. §§ 78a to 78hh–1, "regulates securities markets and the business of securities brokers and dealers." Report of Special Study of Securities Markets of the Securities and Exchange Commission, H. R. Doc. No. 95, pt. 1, 88th Cong., 1st Sess., 3 (1963). Two types of regulation are reflected in the Act. Some provisions impose direct requirements and prohibitions. Among these are mandatory exchange registration, restrictions on broker and dealer borrowing, and the prohibition of manipulative or deceptive practices. Other provisions are flexible and rely on the technique of self-regulation to achieve their objectives. *Ibid.* Supervised self-regulation, although consonant with the traditional private governance of exchanges, allows the Government to

---

[8] This approach is supported by decisions extending back to the turn of the century. *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142 (1963); *Huron Portland Cement Co.* v. *City of Detroit*, 362 U. S. 440 (1960); *International Assn. of Machinists* v. *Gonzales*, 356 U. S. 617 (1958); *Union Brokerage Co.* v. *Jensen*, 322 U. S. 202 (1944); *Savage* v. *Jones*, 225 U. S. 501 (1912).

monitor exchange business in the public interest.[9]  MR.
JUSTICE DOUGLAS, when he was Chairman of the Securi-
ties and Exchange Commission, observed that this per-
mits the exchanges to "take the leadership with Govern-
ment playing a residual role.  Government would keep
the shotgun, so to speak, behind the door, loaded, well
oiled, cleaned, ready for use but with the hope it would
never have to be used."  W. Douglas, Democracy and
Finance 82 (J. Allen ed. 1940).

The Act provides for stock exchanges to be registered
by the Commission.  § 6, 15 U. S. C. § 78f.  It out-
laws securities transactions conducted on unregistered
exchanges.  § 5, 15 U. S. C. § 78e.  It conditions reg-
istration on a showing that the exchange has rules
that are "just and adequate to insure fair dealing and
to protect investors."  § 6 (d), 15 U. S. C. § 78f (d).
An exchange seeking registration must also meet other
requirements.  It must agree "to enforce so far as is
within its powers compliance by its members" with the

---

[9] The first attempt at exchange regulation arose after the panic
of 1907 when, in response to public concern over speculation, Presi-
dent Theodore Roosevelt urged Congress to take action.  42 Cong.
Rec. 1347, 1349 (1908).  Nothing of significance happened, however,
until after the 1929 stock market crash.  It became apparent that
"transactions in securities as commonly conducted upon securities
exchanges and over-the-counter markets are affected with a national
public interest which makes it necessary to provide for regulation
and control of such transactions and of practices and matters
related thereto."  Securities Exchange Act of 1934, § 2, 15 U. S. C.
§ 78b.  Self-regulation was adopted as a means of policing the
exchanges.  The tradition, as has been noted, had been one of self-
governance; the financial community was strongly opposed to gov-
ernmental control of daily exchange business; and the task was
deemed to be of such magnitude that Government simply could not
regulate effectively every aspect of the industry.  Comment, 48
Minn. L. Rev. 597–598 (1964); 2 L. Loss, Securities Regulation
1175–1176 (1961), and 5 id., at 3138–3139 (1969).

Act and the Commission's rules and regulations thereunder. § 6 (a)(1), 15 U. S. C. § 78f (a)(1). It must include in its rules a provision for the disciplining of a member "for conduct or proceeding inconsistent with just and equitable principles of trade." § 6 (b), 15 U. S. C. § 78f (b). And it must supply to the Commission copies of its constitution, articles of incorporation, and bylaws, and such data or other information as the Commission may require "as being necessary or appropriate in the public interest or for the protection of investors." § 6 (a)(3) and (2), 15 U. S. C. § 78f (a) (3) and (2).

The Commission's direct authority with respect to exchange self-regulation is supervisory. Apart from its responsibilities in registering exchanges, the Commission may "alter or supplement" the rules of an exchange if such action is "necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange." § 19 (b), 15 U. S. C. § 78s (b).[10] This authority, however, relates to 12 designated subject areas and "similar matters." *Ibid.* As a consequence, some exchange rules are not subject to direct Commission scrutiny, *In re Rules of the New York Stock Exchange,* 10 S. E. C. 270, 294 (1941), and, instead, if they do not operate contrary to the interests of insuring fair dealing and protecting investors, would kindle no federal curiosity and would serve no identifiable public purpose. It is to be noted, moreover, that the Commission has exercised its direct supervisory power

---

[10] The Commission also has broad rulemaking power under the Act. See, for example, §§ 8, 9, and 11, 15 U. S. C. §§ 78h, 78i, and 78k. No question is presented in this case as to the authority of the Commission to promulgate rules affecting the operation of stock exchanges.

sparingly. Securities Industry Study, Report of the Subcommittee on Securities, Committee on Banking, Housing and Urban Affairs, S. Doc. No. 93–13, p. 180 (1973).

Apart from registration and direct Commission supervision, the only other qualification on exchange autonomy is the statutory requirement that any rules promulgated and enforced by an exchange not be "inconsistent with this [Act] and the rules and regulations thereunder and the applicable laws of the State in which it is located." § 6 (c), 15 U. S. C. § 78f (c).

From this review of relevant portions of the Act, it is apparent that Congress accorded maximum scope to self-regulation, and reposed powers in the Commission "to be exercised as needed but in such manner as to allow maximum initiative and responsibility to the self-regulators." Report of the Special Study, *supra,* pt. 4, p. 726. In the words of the Senate Report issued at the time of enactment,

> "Thus the initiative and responsibility for promulgating regulations pertaining to the administration of their ordinary affairs remain with the exchanges themselves. It is only where they fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so." S. Rep. No. 792, 73d Cong., 2d Sess., 13 (1934).

It is thus clear that the congressional aim in supervised self-regulation is to insure fair dealing and to protect investors from harmful or unfair trading practices. To the extent that any exchange rule or practice contravenes this policy, or any authorized rule or regulation under the Act, the rule may be subject to appropriate federal regulatory supervision or action. Correspondingly, any rule or practice not germane to fair dealing

or investor protection would not appear to fall under the shadow of the federal umbrella; it is, instead, subject to applicable state law.

C. On the other side are the California statutes. By the addition of § 229 to its Labor Code in 1959 California codified for the wage earner, with the solitary collective-bargaining-agreement exception, a right of action to recover due and unpaid wages from his employer, regardless of the existence of any private agreement to arbitrate. Selected 1959 Code Legislation, 34 Cal. St. B. J. 581, 706–707. This was due, apparently, to the legislature's desire to protect the worker from the exploitative employer who would demand that a prospective employee sign away in advance his right to resort to the judicial system for redress of an employment grievance. The statute's legislative history is sparse, but the exception carved out for collective-bargaining disputes provides the obvious conclusion that it was the individual, nonunion, and otherwise unprotected wage earner who was the intended beneficiary of the State's grace in providing this remedy. This conclusion is fortified by the fact that § 200 (a) of the Code defines "wages" broadly to include "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." And the California court itself has noted "the established policy . . . of protecting and promoting" the right, " 'favored' in the law," of the wage earner "to all wages lawfully accrued to him." *City of Ukiah* v. *Fones*, 64 Cal. 2d 104, 108, 410 P. 2d 369, 371 (1966). It may be, too, that the legislature felt that arbitration was a less than adequate protection against awarding the wage earner something short of what was due compensation. In any event, there is the harder substance of California case law. In *Local 659* v. *Color Corp. of America*, 47 Cal. 2d 189, 302 P. 2d

294 (1956), decided prior to the addition of § 229 to the Labor Code, the court held that the then § 1280 of the State's Code of Civil Procedure, providing for the enforcement of an arbitration clause in a contract and characterizing it as "irrevocable," was subject to waiver or mutual rescission. The statute provided that arbitration was required "save upon such grounds as exist at law or in equity for the revocation of any contract." [11] California, thus, does not exclude a remedy available at law or in equity for the revocation of any contract that happens to contain an arbitration clause.

This conclusion as to the broad and liberal intendment of § 229 is reinforced by the Court of Appeal's observation in the present case, 24 Cal. App. 3d, at 44–45, 100 Cal. Rptr., at 798, that the State's Arbitration Act, revised in 1961, embraced no attempt to change the right of action first accorded the wage earner only two years earlier in 1959. The record is clear, moreover, that legislative attention was drawn in 1961 to § 229. The California Senate was asked to reconsider its unanimous vote in favor of the Arbitration Act on the ground that there was legislative uncertainty as to its effect upon § 229. 2 Journal of the Senate 2215–2218 (May 4, 1961). The motion to reconsider was later waived, and the bill was transmitted to the Assembly. *Id.*, at 2287 (May 8, 1961). Thus, the Senate had in mind the rights accorded wage earners by § 229, and those rights were placed in focus with the "historical friendliness of California to the institution of arbitration." Feldman, Arbitration Modernized—The New California Arbitration Act, 34 So. Calif. L. Rev. 413, 414 (1961). Section 229 thus survived subsequent legislative scrutiny and has now mani-

---

[11] Section 1280 was repealed and replaced in 1961 to make the saving clause in § 1281 now read, "save upon such grounds as exist for the revocation of any contract." Cal. Stats. 1961, c. 461, pp. 1540–1541, §§ 1 and 2.

fested itself as an important state policy through interpretation by the California courts.

One might also consider, as the respondent suggests here, the California antitrust policies embodied in § 16600 of the Business and Professions Code, quoted, *supra,* at 121. This statute has been in effect for many years and is well entrenched in case law and in commentary.[12] We need not pursue in depth the policy considerations supporting this statute because, in our judgment, § 16600, standing alone and apart from § 229, under existing case law, would not provide the necessary support to uphold a challenge to arbitration. Our inclination in this respect is buttressed by the different results reached by the California Court of Appeal in this case and in *Frame, supra,* respectively. In *Frame,* the court decided that the "strong [California] public policy" against restraining one from engaging in a lawful business foreclosed the application of the more permissive New York law to the forfeiture provision of the profit-sharing plan. Although California public policy thus served to nullify the contract's forfeiture provision, arbitration, nonetheless, was not precluded. By way of contrast, the present case provoked a claim under § 229, in addition to Ware's reliance on § 16600, in the face of Merrill Lynch's motion to compel arbitration. The California court declared again that the forfeiture clause was invalid but, in addition, held that the arbitration clause was unenforceable, relying on § 16600 and § 229, respectively. With this analysis of the state statutes made by the California court, we rest on that court's interpretation of state law and do not, and in fact cannot, disturb its determination that under those statutes arbitration will lie in the one instance but not in the other.

---

[12] See citations following § 16600 in West's Ann. Calif. Bus. & Prof. Code 41 *et seq.*

134

With this background, we turn to specific arguments advanced by the petitioner here.

## III

A. Merrill Lynch suggests that Rule 347 (b) of the New York Stock Exchange, set forth in n. 3, *supra,* falls under the Exchange's mandate to protect the investing public and to insure just and equitable trade practices.[13]   Its contention is that confidence in the industry and in the integrity and ability of its members has been jeopardized by failures of major brokerage houses with consequent substantial losses to the public. Investor confidence would be further undermined, it is said, by protracted litigation between member firms and their employees over disputes that arise out of employment relationships; public airing of every claim of this kind will erode confidence in the market; and arbitration, on the other hand, will internalize these disputes and provide an expeditious and economical method of resolution by arbitrators familiar with industry customs and practices.

As is seen by our discussion above, §§ 6 (d) and 19 (b) of the Act, 15 U. S. C. §§ 78f (d) and 78s (b), establish the measure of congressionally delegated authority for self-regulation in the national interest.  Section 6 (d) requires that exchange rules be "just and adequate to insure fair dealing and to protect investors."  Section 19 (b) gives the Commission limited power over certain types of exchange rules "for the protection of investors

---

[13] The phrase "just and equitable trade practices" would be inappropriately used to justify Rule 347 (b).   This is because the standard refers to rules adopted pursuant to § 6 (b) of the Act, 15 U. S. C. § 78f (b), providing for the expulsion, suspension, or disciplining of a member "for conduct or proceeding inconsistent with just and equitable principles of trade."   Arbitration is not the type of disciplinary rule that § 6 (b) contemplates.

or to insure fair dealing in securities" or to "insure fair administration" of the exchanges.[14] Measured by these standards, we conclude that the policy arguments advanced by Merrill Lynch do not require pre-emption of contrary state law by Rule 347 (b).

To begin with the obvious, there is nothing in the Act and there is no Commission rule or regulation that specifies arbitration as the favored means of resolving employer-employee disputes.[15] It is also clear that Rule 347 (b) would not be subject to the Commission's modification or review under § 19 (b). The United States, as *amicus*, concedes as much, and we conclude, as the Government suggests, that the relationship between compulsory employer-employee arbitration and fair dealing and investor protection is "extremely attenuated and peripheral, if it exists at all." Brief for the United States 9. Merrill Lynch has not alleged that arbitration will effect fair dealing or result in investor protection. It suggests only that investor confidence not be shaken

[14] As noted, *supra*, at 129, the Commission's review power over exchange rules is circumscribed by certain subject matter limitations explicitly enumerated in § 19 (b). None of the subject matter categories suggests that the Commission has review authority with respect to a rule requiring arbitration of employer-employee disputes.

[15] This Court and other federal courts, of course, have endorsed the suitability of arbitration to resolve federally created rights. *Wilko* v. *Swan*, 346 U. S. 427, 431 (1953); *Coenen* v. *R. W. Pressprich & Co.*, 453 F. 2d 1209 (CA2), cert. denied, 406 U. S. 949 (1972). See other cases cited by MR. JUSTICE WHITE in his dissenting opinion in *U. S. Bulk Carriers, Inc.* v. *Arguelles*, 400 U. S. 351, 374–375 (1971). These cases, however, concern situations where a federal act itself has provided for arbitration. Yet in *Wilko* v. *Swan* an investor customer's agreement to arbitrate was held void under § 14 of the Securities Act of 1933, 15 U. S. C. § 77n, notwithstanding the provisions of § 3 of the United States Arbitration Act, 9 U. S. C. § 3. See *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395 (1967).

further by public airing of employer-employee disputes. There is no explanation of why a judicial proceeding, even though public, would undermine investor confidence. It is difficult to understand why muffling a grievance in the cloakroom of arbitration would prevent lessening of confidence in the market. To the contrary, for the generally sophisticated investing public, market confidence may tend to be restored in the light of impartial public court adjudication. Furthermore, it should be apparent that, so far as investor confidence is concerned, compulsory arbitration of an employee-employer grievance is no substitute for direct effective disciplinary action against any abusive exchange practice. Other rules of the Exchange serve this very function. Rule 345 (b), for example, permits the Exchange to disapprove, and thereby to forestall, the employment of any person, and Rule 345 (d) spells out punitive measures for "conduct inconsistent with just and equitable principles of trade," or "acts detrimental to the interest or welfare of the Exchange," or "conduct contrary to an established practice of the Exchange." These measures, designed to insure fair dealing and to protect investors, are of the kind directly related to the Act's purposes and ordinarily would not be expected to yield to provisions of state law.

B. Rule 347 (b) cannot be categorized, as the petitioner suggests, as part of a need for uniform national regulation. There is no revelation in the Act or in any Commission rule or regulation that nationwide uniformity of an exchange's housekeeping affairs is necessary or desirable. And Merrill Lynch has not demonstrated that national uniformity in the area of wage claims is vital, in some way, to federal securities policy. Convenience in exchange management may be desirable, but it does not support a plea for uniform application when the rule to be applied is not necessary for the achievement of the national policy objectives reflected in

the Act. Indeed, Congress, in the securities field, has not adopted a regulation system wholly apart from and exclusive of state regulation. Cf. *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 234–236 (1947); *Campbell* v. *Hussey,* 368 U. S. 297, 302 (1961). Instead, Congress intended to subject the exchanges to state regulation that is not inconsistent with the federal Act. Section 6 (c), 15 U. S. C. § 78f (c), explicitly subjects exchange rules to a requirement of consistency with the Act "and the applicable laws of the State in which [the exchange] is located." "Where the Government has provided for collaboration the courts should not find conflict." *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 209 (1944). And we observed in *Silver* that the scheme of self-regulation provides in some cases for no agency check on exchange behavior and, therefore, "[s]ome form of review of exchange self-policing, whether by administrative agency or by the courts, is . . . not at all incompatible with the fulfillment of the aims of the Securities Exchange Act." 373 U. S., at 359.

C. It is also argued that the applicable state laws referred to in § 6 (c) are the laws of the State in which the exchange itself is located. Thus, because the New York Stock Exchange is in the city of New York, it is said that "the applicable laws" are those of New York, and that the California court was in error in not applying New York law that would have compelled arbitration of this dispute and would have validated the forfeiture provision of the Profit-Sharing Plan.

We are not persuaded that this is what Congress intended. Section 6 (c) has no independent existence creating some sort of spurious uniformity of application for all States. It has meaning only in the context of the assertion of a federal interest, and it hinges on our determination that the particular rule be integrally related to or substantially effect the aims and purposes of the

Act. It merely requires that any exchange rule adopted outside the context of the Act be consistent with the laws of the State in which the exchange is located.[16]

If the rule is sought to be enforced in another State, normal conflict of laws principles come into play, and the rule's effect depends on the resolution of that conflict. Were this not so, there would be no purpose behind the choice-of-law clause in the Profit-Sharing Plan itself. More importantly, the uniform application Merrill Lynch's interpretation of the Act would purportedly foster is seen to be ephemeral when one considers that broker-dealers like petitioner are also members of exchanges located outside New York, and are therefore subject, under the "state of location" theory, to other States' laws. In effect, we are asked to sacrifice the individual's expectation of uniform treatment in the State of his residence for uniformity of application of the effect of an exchange's rules. We decline to do so because we believe that Congress intended that those elements of the old regime of complete self-regulation, that is, those elements not related to the federal objectives, be subject to state law and to established conflicts principles when their application out of State comes into controversy. After all, a stock exchange is organized as an association in

---

[16] The Act contains other provisions indicating the intent of Congress that state law continues to apply where the Act itself does not. Thus, § 28 (a), 15 U. S. C. § 78bb (a), states that the rights and remedies provided by the Act "shall be in addition to any and all other rights and remedies that may exist at law or in equity." It further provides that nothing in the Act "shall affect the jurisdiction of the securities commission . . . of any State . . . insofar as it does not conflict with the provisions" of the Act "or the rules and regulations thereunder." Section 28 (b), 15 U. S. C. § 78bb (b), provides that nothing in the Act "shall be construed to modify existing law . . . with regard to the binding effect . . . of [exchange] action taken . . . to settle disputes between its members . . . on any person who has agreed to be bound thereby."

accordance with the laws of the State of its location. Any assertion of extraterritorial jurisdiction contends, of course, with the public policy of the State in which this jurisdiction is sought. To ascribe more to § 6 (c) would be contrary to the congressional scheme and to what might be regarded as common sense.

D. MR. JUSTICE BRENNAN has stated:

"The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142 (1963).

In other contexts, pre-emption has been measured by whether the state statute frustrates any part of the purpose of the federal legislation. *Colorado Anti-Discrimination Comm'n* v. *Continental Air Lines, Inc.,* 372 U. S. 714, 724 (1963); *Perez* v. *Campbell,* 402 U. S. 637 (1971); *Rice* v. *Board of Trade,* 331 U. S. 247, 253–255 (1947). And only last term MR. JUSTICE DOUGLAS, in speaking for the Court, observed that while prior cases on pre-emption "are not precise guidelines," because each case turns on the peculiarities and special features of the federal regulatory scheme in question," it is where there is in existence a pervasive and comprehensive scheme of federal regulation that pre-emption follows in order to fulfill the federal statutory purposes. *City of Burbank* v. *Lockheed Air Terminal, Inc.,* 411 U. S. 624, 638–639 (1973).

In the area of regulation that we are considering here, California has manifested a strong policy of protecting its wage earners from what it regards as undesirable economic pressures affecting the employment relation-

ship. This policy prevails in the absence of interference with the federal regulatory scheme. We find no such interference and we also find in the structure of the Act an intent on the part of Congress that state policies in this area should operate vigorously.

E. It is suggested, finally, that the petitioner's Profit-Sharing Plan operates on a national level; that it is open to all eligible Merrill Lynch employees in the United States; that the employment of respondent and the class he represents is interstate in nature, as is Merrill Lynch's business; and that the application of the California statutes would unduly burden interstate commerce.

What has been said above provides the answer to this argument. It is in line with the principle, long established, that the National Government's power, under the Commerce Clause, to regulate commerce does not exclude all state power of regulation. *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761, 766–767 (1945); *Brotherhood of Locomotive Firemen & Enginemen* v. *Chicago, R. I. & P. R. Co.*, 393 U. S. 129 (1968); *Huron Portland Cement Co.* v. *Detroit*, 362 U. S. 440 (1960).

The judgment of the Court of Appeal is affirmed.

*It is so ordered.*

MR. JUSTICE STEWART took no part in the decision of this case.