ROBERT ORMAN, on Behalf of Himself and All Similarly Situated Schwab Customers, Plaintiff-Appellant, v. CHARLES SCHWAB AND COMPANY, INC., Defendant-Appellee.—GORDON RUBENSTEIN, on Behalf of Himself and All Similarly Situated Quick and Reilly Customers, Plaintiff-Appellant, v. QUICK AND REILLY, INC., *et al.*, Defendants-Appellees.—LEONARD M. BLAND, on Behalf of Himself and All Similarly Situated Olde Discount Corporation Customers, Plaintiff-Appellant, v. OLDE DISCOUNT CORPORA-TION, Defendant-Appellee.

First District (2nd Division)   Nos. 1—94—2277, 1—94—3423, 1—94—3424 cons.

Opinion filed December 24, 1996.

ZWICK, P.J., dissenting.

Much, Shelist, Freed, Denenberg & Ament, Susman, Buehler & Watkins, and Daniel Harris, all of Chicago, Francine Schwartz, of Arlington Heights, and Allan Kanner & Associates, of New Orleans, Louisiana, for appellants.

Baker & McKenzie, of Chicago (Francis D. Morrissey and Michael Pollard, of counsel), for appellees.

JUSTICE RAKOWSKI delivered the opinion of the court:

Plaintiffs Robert Orman, Gordon Rubenstein, and Leonard M. Bland (customers) filed complaints against defendants, Charles Schwab & Co., Quick & Reilly, Inc., and Olde Discount Corporation (brokers), respectively, alleging that brokers violated state common and statutory law when they conducted stock trades on behalf of customers. In particular, the brokers breached their fiduciary duties by keeping certain profits (order flow payments) without adequate disclosure to or authorization from the customers. Each suit was dismissed on the brokers' combination motions under sections 2—615 and 2—619 of the Code of Civil Procedure. 735 ILCS 5/2—615, 5/2—619 (West 1994). The trial court, in each case, found that the customers' claims were preempted by federal law. Plaintiffs appeal, contending the trial courts erroneously held that their actions were preempted. The cases were consolidated for appeal.

The sole issue is whether the customers' claims based on state common and statutory law are preempted by the Securities Exchange Act of 1934 (the Act) (15 U.S.C. § 78a et seq. (1994)). We affirm.

## FACTS

As stated in the facts by the parties, pursuant to standard form

contracts between the customers and brokers, each broker was employed to buy and/or sell stocks on the customer's behalf, for which the broker would received a commission. In such capacity, the broker acted as the customer's agent. When a customer placed an order, the broker could execute it in various markets. The broker would contact a market maker of its choice to effectuate the required trade. The price obtained was negotiated between the broker and the market maker. The market maker made a profit on every trade. To induce brokers to deal through them, market makers shared part of their profit with the brokers. This practice is known as order flow payments. It is a recognized and widespread practice in the industry and part of the competitive market.

Brokers retained the order flow payments and did not pass them on to customers. In their complaints, plaintiffs allege that the brokers breached their fiduciary duties by retaining the payments without adequate disclosure to them or authorization from them. Subsequent to each transaction, the broker sent a confirmation slip to the customer containing the disclosure required by the Securities and Exchange Commission (the SEC); however, the brokers did not disclose order flow payments.

Plaintiffs filed suits alleging claims for breach of fiduciary duty, unjust enrichment, unfair and deceptive business practices, and breach of contract based on the brokers' retention of the order flow payments.

## ANALYSIS

■ "The purpose of a motion to dismiss under section 2—619 *** is to afford litigants a means to dispose of issues of law and easily proved issues of fact at the outset of a case, reserving disputed questions of fact for a jury trial." *Zedella v. Gibson*, 165 Ill. 2d 181, 185 (1995). All well-pleaded facts in the complaint are admitted, but conclusions of law and fact unsupported by specific allegations are not. *Draper v. Frontier Insurance Co.*, 265 Ill. App. 3d 739, 742 (1994). The trial court must construe the motion and supporting documents in the light most favorable to the nonmovant. *Draper*, 265 Ill. App. 3d at 742. "Section 2—619(a)(9) allows dismissal when 'the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim.' " *Zedella*, 165 Ill. 2d at 185, quoting Ill. Rev. Stat. 1991, ch. 110, par. 2—619. Preemption is an affirmative matter. *Russo v. Boland*, 103 Ill. App. 3d 905, 909-10 (1982). "The question on appeal is 'whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law.' " *Zedella*,

165 Ill. 2d at 185-86, quoting *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993). We review the trial court's decision *de novo. Kedzie*, 156 Ill. 2d at 116.

■ Congress promulgated the Act, which created the SEC and delegated to it the responsibility for oversight of the securities industry. Federal oversight was designed to: (1) protect the investing public; (2) remove impediments to smooth operation of the national market; and (3) impose reporting requirements that ensure a fair and honest market. *Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918, 924 (Minn. 1996). In 1977, the SEC adopted Rule 10b—10, which outlined the necessary disclosure brokers were required to furnish their clients. 17 C.F.R. § 240.10b—10 (1994). Rule 10b—10 mandated brokers to furnish written notification at or before completion of a transaction, which included:

> "The source and amount of any other remuneration received or to be received by him in connection with the transaction: Provided, however, *** the written notification may state whether any other remuneration has been or will be received and that the source and amount of such other remuneration will be furnished upon written request of such customer." 17 C.F.R. § 240.10b—10(a)(7)(iii) (1994).

Originally, the rule made no specific reference to order flow payments.

The rule was amended effective October 2, 1995, which added disclosure requirements concerning order flow payments. The rule now states that brokers must provide customers with "a statement whether payment for order flow is received by the broker or dealer for transactions in such securities and that the source and nature of the compensation received in connection with the particular transaction will be furnished upon written request of the customer." 17 C.F.R. § 240.10b—10(a)(7)(iii) (1996). This disclosure must be made to the customer at the time the customer opens his or her account. 17 C.F.R. § 240.11Ac1—3(a) (1996).

All of the acts giving rise to the instant case occurred prior to the 1995 amendment.

Plaintiffs contend the Act does not preempt state regulation of securities. They argue this is particularly true in light of section 28(a), which provides that "[t]he rights and remedies provided by this title shall be in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. § 78bb(a) (1994). They further contend that the pre-1995 version of Rule 10b—10 did not encompass order flow payments and, therefore, does not preempt state law.

The parties submit decisions from four jurisdictions, and independent research has disclosed no others. Three of the jurisdictions (New York, Minnesota, and California) find that federal law preempts state regulation of securities. Only the federal district courts for Louisiana hold that state claims based on state laws are not barred. All acts giving rise to each of these cases occurred prior to the 1995 amendment of Rule 10b—10, as in the instant case.

■ Federal law may preempt state law either expressly or impliedly. No express preemption exists here. See *Dahl*, 545 N.W.2d at 923. Thus, if state claims are preempted, it must be by implication.

> "The United States Supreme Court has identified a two-pronged analysis for determining whether Congress made such an implication [(implied preemption)]. State law is preempted if Congress has entirely displaced the possibility of state regulation or if state regulation conflicts with federal law. [Citation.] The Court has indicated that four main considerations are relevant to an inquiry into whether Congress has impliedly displaced possible state regulation: 1) the scheme of federal regulation may be so pervasive as to leave no room for supplemental state action; 2) the federal interest may be so dominant that state regulation will be presumptively precluded; 3) the objective of the federal regulation may reveal a preemptive purpose; or 4) the state policy may produce a result inconsistent with that federal objective. [Citation.] State law will conflict with federal law when 'compliance with both federal and state regulations is a physical impossibility' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Dahl*, 545 N.W.2d at 924, quoting *Pacific Gas & Electric v. State Energy Resources Comm'n*, 461 U.S. 190, 204, 75 L. Ed. 2d 752, 765, 103 S. Ct. 1713, 1722 (1983).

In *Guice v. Charles Schwab & Co.*, 89 N.Y.2d 31, 674 N.E.2d 282, 651 N.Y.S.2d 352 (1996), the New York Court of Appeals held that plaintiffs' state claims were preempted. Plaintiffs argued defendants breached their fiduciary duties by retaining order flow payments without adequate disclosure. The court rejected this argument, finding the state claims preempted by the 1975 amendments to the Act as implemented by SEC regulations. The *Guice* court determined that the 1975 amendments granted the SEC authority to shape a *new* national market system, gave it power to regulate, and authorized it to police the new system. One of the goals of the 1975 amendments was to develop a "national market system for security trading" (*Guice*, 89 N.Y.2d at 46, 674 N.E.2d at 289,651 N.Y.S.2d at 359) which was to be policed by a "coherent and rational regulatory structure" (*Guice*, 89 N.Y.2d at 45, 674 N.E.2d at 289, 651 N.Y.S.2d at 359). The SEC was directed to administer

this structure, which it did through regulations. In furtherance of these goals, in 1977, the SEC adopted Rule 10b—10, a uniform rule for all transactions in the national market. According to *Guice*, the SEC had monitored and studied the securities industry for years and consistently applied Rule 10b—10 to order flow payments. The *Guice* court noted that the SEC amended Rule 10b—10 after recognizing that order flow payments furthered purposes of Congress "by enhancing more efficient and less costly execution of customers' orders and by promoting competition." *Guice*, 89 N.Y.2d at 46, 674 N.E.2d at 289-90, 651 N.Y.S.2d at 359-60. Although the amendment occurred after the facts giving rise to the claims in *Guice*, the court implied that this amendment demonstrated the SEC's continued regulation of order flow payments.

*Guice* rejected plaintiffs' argument that section 28(a) foreclosed preemption of areas other than those explicitly listed in that section.

In finding preemption, the court reasoned that state claims would serve as an obstacle to federal goals and, thus, could not endure. It based its rationale on the legislative history of the 1975 amendments and the SEC's history of regulating order flow payments. First, the court was:

> "[C]onvinced that permitting the courts of each State to enforce [their] common-law agency standards of disclosure on the practice of order flow payments *** would unavoidably result in serious interference with the 'accomplishment and execution of the full purposes and objectives of Congress' [citation], in enacting the 1975 amendments, and would directly conflict with SEC regulations limiting the disclosure requirements regarding receipt of order flow payments ***." *Guice*, 89 N.Y.2d at 46, 674 N.E.2d at 289, 651 N.Y.S.2d at 359.

Likewise:

> "Permitting the courts of each State to impose civil liability on national securities brokerage firms, ***, for failure to meet more stringent common-law agency standards of disclosure of receipt of order flow payments (rather than the federally-mandated *uniform* specific disclosure ***) would inevitably defeat the congressional purpose of enabling the SEC to develop and police that 'coherent regulatory structure' for a national market system." (Emphasis in original.) *Guice*, 89 N.Y.2d at 46, 674 N.E.2d at 290, 651 N.Y.S.2d at 360.

If each state were allowed to specify the nature of disclosure, brokerage firms would be required to tailor their disclosure statements to each state's law and the "carefully-crafted SEC disclosure requirements would have little, if any, influence." *Guice*, 89 N.Y.2d at 47, 674 N.E.2d at 290, 651 N.Y.S.2d at 360. Because the state law would adversely affect the SEC's ability to regulate uniformly, the state law was preempted.

The *Guice* court also determined the objectives of Congress would be thwarted in a second way: order flow payments would be

eliminated. "At worst, onerous stricter disclosure costs plus the threat of lawsuits all around the country, based on breach of common-law agency relationships, would likely result in many brokerage firms abandoning acceptance of order flow payments altogether, an even more drastic undermining of congressional objectives." *Guice,* 89 N.Y.2d at 47, 674 N.E.2d at 290, 651 N.Y.S.2d at 360. The SEC clearly authorizes the use of order flow payments and recognizes its benefit to the industry. Any activity that defeats this goal is an obstacle to federal law.

In sum, the court stated:

> "The stricter standards of order flow payment disclosure which may be required under State common-law agency principles inevitably will supplant the disclosure rules of the SEC on the same subject and come to dominate the relationship between broker and customer ***.
>
> *** Thus, *** State enforcement *** cannot help but upset the policy-based delicate balance Congress directed the SEC to achieve in the regulatory regime envisaged under the 1975 amendments to the Securities Exchange Act." *Guice,* 89 N.Y.2d at 48-49, 674 N.E.2d at 291, 651 N.Y.S.2d at 361.

In *Dahl,* 545 N.W.2d 918, the Minnesota Supreme Court ruled that the SEC rules preempted plaintiffs' state common and statutory law actions. Before stating its rationale for finding preemption, the court rejected several of the parties' arguments, which correspond to arguments raised in the instant case. First, it rejected plaintiffs' argument that only those areas specifically identified in section 28(a), and no others, were preempted, stating that the savings clause provision in section 28 did "not prevent implied preemption of areas of securities law not specified in the clause." *Dahl,* 545 N.W.2d at 923. Second, it rejected defendants' argument that the pre-1995 version of Rule 10b—10 expressly preempted state law. The *Dahl* court stated that the "SEC *** had no rule in place expressly mentioning order flow payments." *Dahl,* 545 N.W.2d at 923. Third, it concluded that Rule 10b—10 as amended in 1995 did not apply since it was not in effect at the time the trades giving rise to the claims in *Dahl* were conducted.

The *Dahl* court found implied preemption, based on state laws being an obstacle to federal goals. Because the securities industry is not only national, but also international, the *Dahl* court asserted that a decision by any particular state court would reach beyond the state's border. Thus, although it would be possible for brokers to comply with both state and federal disclosure regulations, individual disclosure requirements would frustrate the federal objectives. In *Dahl,* as in the case before us, plaintiffs sought to impose a duty upon brokers to either obtain the consent of the customer to retain order flow payments *prior* to a transaction, or to remit the payments

to customers. Defendants contended, as they do in the instant case, that such a requirement would in effect lead to the extinction of order flow payments. The court agreed with defendants.

> "For Schwab to fully comply with these state agency law requirements, it would need to be able to ascertain the exact amounts of these profits [order flow payments] in order to seek its clients' consent, or to remit them to its customers if consent were withheld. Since it cannot parse out order flow payments to such a degree, compliance with the potential consent requirements of Minnesota law might put an end to the practice of order flow payments, which is allowed under federal law. Thus, the remedy [customers] seek could frustrate the objectives of the SEC and Congress." *Dahl*, 545 N.W.2d at 925.

Finally, in *McKey v. Charles Schwab & Co.*, No. BC139314 (Cal. Super. Ct. September 10, 1996), and *Miller v. Charles Schwab & Co.*, No. BC137133 (Cal. Super. Ct. September 10, 1996), the superior court of California for Los Angeles County found plaintiffs' state claims preempted. It too noted that the pre-1995 version of Rule 10b—10 is part of an overall regulatory scheme that would be frustrated by allowing individual state adjudication of disclosure requirements. According to this court, "[i]t strikes the Court as poor public policy to create confusion, by allowing a proliferation of common law disclosure standards, from California and presumably 49 other states, in the interest of protecting an intangible principle of 'better disclosure' where there is no tangible damage." *McKey*, slip op. at 1. In sum, the "additional standards proposed by *** plaintiff[s] would stand as an obstacle to the federal regulatory scheme." *McKey*, slip op. at 1.

Conversely, the federal districts courts for both the Eastern and Western Districts of Louisiana have held that state claims are not preempted. *Thomas v. Charles Schwab & Co.*, No. 95—0307 (W.D. La. July 12, 1995); *Dumont v. Charles Schwab & Co.*, No. 95—0606 (E.D. La. May 4, 1995).

In *Thomas*, the court stated "Congress has not expressly preempted state law and, after a review of the record, this court finds that congressional intent to preempt state law cannot be inferred." *Thomas*, slip op. at 3. *Thomas* concluded:

> "[A]ddditional disclosure regarding 'amount of remuneration' and that 'the remuneration was paid by a party whose interests are adverse to those of the customer' will not conflict with this SEC regulation nor act as an obstacle to the protection of a fair competitive market and investor interests.
>
> In addition, defendant has not persuaded this court that it was Congress' intent to provide comprehensive regulation dealing

with the *disclosure of order flow payments* to the exclusion of all state laws regarding agency and fiduciary duties." *Thomas*, slip op. at 4.

In *Dumont*, the court determined that section 28(a) neither expressly preempted state law nor demonstrated a pervasive federal regulatory scheme. Based on this finding, the court stated:

"Where as here, Congress has not explicitly or implicitly displaced all state regulation in a specified field, preemption arises only if compliance with both federal and state law is an impossibility or when the state law is an obstacle to the accomplishment of the purposes of the federal scheme. Although applying the Louisiana standard of fiduciaries to a national brokerage company such as Schwab may require a stricter standard of care to its customers, the application of Louisiana law does not conflict with the SEC's authority and power to regulate the securities industry, and compliance with both federal regulations and the stricter Louisiana standard of care is not impossible. Moreover, since greater disclosure could benefit the investor, the applicable of Louisiana law may indeed serve the basic purpose of federal laws and regulations." *Dumont*, slip op. at ____.

■ We find the decisions from New York, Minnesota, and California persuasive. Each extensively discussed the history and scheme of the securities market and federal participation in it. As all of them commented, the securities industry is a national market which must be regulated uniformly. To allow plaintiffs' causes of action to survive in the Illinois state courts, the federal uniformity goal will be frustrated, if not destroyed. If different state disclosure requirements must be met by brokerage firms across the nation, uniformity will not exist. If uniformity is not to prevail, neither Rule 10b—10 nor the SEC would serve any function or purpose in regulating disclosure. Accordingly, the goals of the federal government would be frustrated. While stricter disclosure requirements may be advantageous, as Rule 10b—10 now requires, the SEC's amendment of the rule demonstrates its intent to regulate the area and to set forth the necessary disclosure requirements.

While we agree with *Thomas* and *Dumont* that state disclosure regulations may not directly conflict with federal law, we do not agree with their conclusions that state law is no obstacle to the federal goals. Although stricter disclosure may serve the federal goal of protecting investors, the *Dumont* court ignores the fact that the law of Louisiana may be different than the laws of the 49 other states. It gives no rationale regarding the lack of uniformity among the states nor the effect different laws would have on the securities industry. The *Thomas* court looked only to and was concerned with

the law of Louisiana. Additionally, the *Thomas* court cites no authority in support of its decision and fails to discuss or even address Rule 10b—10 except in passing. The court in *Dumont* relied on section 28(a), with only a brief discussion of Rule 10b—10, and provided little, if any, basis for its decision. Thus, we find *Thomas* and *Dumont* unconvincing.

For these reasons and those additional reasons outlined in *Guice* and *Dahl*, we conclude plaintiffs' claims were barred by federal preemption, thus, defeating them. Consequently, the trial court properly dismissed plaintiffs' complaints as a matter of law.

For the foregoing reasons, the decision of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA, J., concurs.

PRESIDING JUSTICE ZWICK, dissenting:

The majority concludes that common law agency principles are implicitly preempted by the implementation by the Securities and Exchange Commission Rule 10b—10. It reaches this conclusion by adopting the sweeping and erroneous premise that "the securities industry is a national market which must be regulated uniformly." 285 Ill. App. 3d at 945. In my view, the majority has gotten it exactly backwards. The disclosure by an agent to his principle that he is earning additional remuneration or a "kickback" does nothing to interfere with uniform regulation of the securities industry.

In passing the securities laws, Congress deliberately created a *dual* system of regulation in which *both* federal and state laws govern industry participants, so long as state regulation is not inconsistent with federal law. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 137, 38 L. Ed. 2d 348, 365, 94 S. Ct. 383, 394-95 (1973). Section 28(a) of the Exchange Act could not be clearer: [t]he rights and remedies provided by this chapter shall be *in addition to* any and all other rights and remedies that may exist at law or inequity." (Emphasis added.) 15 U.S.C. 78bb(a) (1994). To this end, Rule 10b—10 was promulgated by the SEC in 1977 to set forth the *minimum* disclosure requirements, not displace those disclosures required by the common law.

Rule 10b—10 is entitled "Confirmation of Transactions" and sets forth various disclosures that a broker or dealer must make to customers in writing at or before the completion of certain transactions. In the release announcing the adoption of the rule, the SEC stated in pertinent part:

"The rule does not attempt to set forth all possible categories of material information to be disclosed by broker-dealers in connection with a particular transaction in securities. Rule 10b—10 only mandates the disclosure of information which can generally be expected to be material. Of course, in particular circumstances, additional information may be material and disclosure may be required." Securities Exchange Act Release No. 13,508 (May 5, 1977).

Thus, Rule 10b—10 was never intended to serve as a "safe harbor."

Throughout the process of adopting, and then amending, Rule 10b—10, the Securities and Exchange Commission has maintained the position that additional disclosure beyond the SEC rules may be required. See, *e.g., Ettinger v. Merrill Lynch, Pierce, Fenner & Smith,* 835 F.2d 1031, 1035 (3d Cir. 1987). Although the SEC ultimately adopted a safe harbor for brokers and dealers in Rule 11Ac1—3 (17 C.F.R. § 240.11Ac1—3 (1996)), which provides a mechanism pursuant to which brokers and dealers can effectively disclose payment for order flow concerns to customers *prior* to the establishment of a agent/principal relationship, it is important to keep in mind that this new rule was *not* in effect at the time the transactions now at issue took place. Rule 11Ac1—3, therefore, is simply not relevant to the plaintiffs' claims or to our preemption analysis.

If the allegations of plaintiffs' complaint are taken as true, as they must be at this stage of the proceedings, it is clear that the plaintiffs have alleged a valid cause of action. This case is indistinguishable from *Janes v. First Federal Savings & Loan Ass'n,* 57 Ill. 2d 398, 312 N.E.2d 605 (1974), in which a lender that obtained title insurance for its customers and then received rebates from the title company for sending it the business was held to have a fiduciary duty to pass the rebate money on to the customers. The supreme court noted that, "[u]nless otherwise agreed, an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal." *Janes,* 57 Ill. 2d at 410, quoting Restatement (Second) of Agency § 388 (1958). There are any number of similar opinions, from Illinois as well as from other jurisdictions, stating this same long-standing and fundamental agency principle.

The prior disclosures required by the common law for an agent to keep the type of "kickbacks" that order flow payments represent in no way represent an obstacle to the federal goal of establishing an efficient and equitable national market. If brokers and dealers wish to earn a profit in executing their clients' orders in addition to their bargained-for commissions, all that the common law requires is for

brokers and dealers to disclose this additional remuneration prior to entering into the agency relationship with their clients, as Rule 11Ac1—3 now contemplates. In that they hold otherwise, the cases relied upon by the majority are wrongly decided.

The *Guice* court reasoned that since the 1975 amendments to the Securities Exchange Act were designed, in part, to create a "uniform" national market, the SEC must have intended to promote a "uniform" rule for order flow payments when it promulgated Rule 10b—10 in 1977. Yet my research indicates that payment for order flow is a fairly recent practice that grew up *after* the SEC's promulgation of Rule 10b—10 in 1977. Order flow payments appear to have first come to the attention of the news media and the National Association of Securities Dealers only in 1985. See Note, *The Perils of Payment for Order Flow*, 107 Harv. L. Rev. 1675, 1676 n.8 (1994); J. Sasseen, *Dirty Little Secret*, Forbes, June 17, 1985, at 203. It follows that payment for order flow by brokers *could not* have been contemplated or specifically regulated in 1977 by Rule 10b—10 when the SEC promulgated the rule. It is not surprising, therefore, that the 1976 SEC release asking for public comment on then proposed Rule 10b—10 does not mention payment for order flow. Instead, the release explains that the proposed rule is designed to deal with a quite different problem, namely, "with agency crosses in the over-the-counter market where the broker acts as agent for *both* the buyer and the seller." (Emphasis added.) Securities Exchange Comm'n Proposed Rulemaking, Exchange Act Release No. 12,806 (September 16, 1976). Similarly, the 1977 SEC release that accompanied the final rule discusses how the rule would be applied when a brokerage firm represents the buyer and seller in the same transaction. Securities Exchange Act Release No. 13,508 (May 5, 1977).

The Minnesota Supreme Court's recent opinion in *Dahl* is no more compelling. The *Dahl* court concludes that, "For [defendant] Schwab to fully comply with these state agency law requirements, it would need to be able to ascertain the exact amounts of these profits in order to seek its clients' consent, or to remit them to its customers if consent were withheld." *Dahl*, 545 N.W.2d at 925. This conclusion is unsupported by agency law, logic or the record in our case.

An agency is a consensual relationship. *State Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 595, 630 N.E.2d 940 (1994). As such, the relationship can be modified by mutual agreement as the parties see fit. All the defendants need have done to comply with the common law was to have informed their clients that, as a condition of accepting client business, the defendants would insist on retaining any order flow payments received in connection

with the execution of client orders. Defendants elected not to do so. If the defendants now believe they have an onerous obligation under the common law to refund order flow payments, I can only conclude that they have brought this obligation upon themselves by not fully informing their clients of the true nature of their remuneration.

For the above reasons, I respectfully dissent.