## HUNTER DISTRIBUTING CO., INC., Plaintiff,

v.

## PURE BEVERAGE PARTNERS, Defendant.

### No. 1:92CV063–S–D.

United States District Court,
N.D. Mississippi, E.D.

May 5, 1993.

Hunter M. Gholson, Gholson, Hicks, Nichols & Ward, Columbus, MS, for plaintiff.

Kenneth A. Rutherford, Thomas, Price, Alston, Jones & Davis, Jackson, MS, for defendant.

## OPINION

SENTER, Chief Judge.

This case, which involves, among other things, a contract dispute, is presently before the court on defendant's 12(b)(3) motion to dismiss for improper venue and plaintiff's motion to strike.[1] The question which this

---

1. Approximately one month after defendant submitted its rebuttal to plaintiff's response to the dismissal motion, plaintiff moved to strike two affidavits attached to the rebuttal which, according to plaintiff, "contain opinions, conclusions, characterizations, speculations and inferences, instead of facts...." Although certain statements in these affidavits do meet this characterization, others do not and are clearly made from personal knowledge of the events leading up to the signing of the subject contract. The court notes that certain material in the affidavit submitted by plaintiff in response is equally conclusory and speculative, and, in fact, some state-

court must answer is whether a forum selection clause contained in the parties' contract, specifying the courts of Arizona as the proper venue, should be enforced.

## FACTS

### I.

Plaintiff, which distributes canned and bottled beverages (including Coors beer) to retail merchants within three counties and two cities in Mississippi, is a Mississippi corporation with its principal place of business in Columbus, Mississippi. It employs seventeen people at its Columbus facility. Defendant is an Arizona general partnership and is the wholesaler or "master distributor" of the beverage "Clearly Canadian," a bottled sparkling water, for several states, including Mississippi.

### II.

In the spring of 1991, Dub DuPerier, Vice President and General Manager of Wine & Spirits of the South, a beverage broker business, began contacting various Mississippi beverage distributors in an effort to promote Clearly Canadian.[2] At that time, Clearly Canadian was a new product with a zero market share in the state of Mississippi (this remained true until the time plaintiff eventually began distributing the beverage); consequently, a number of the distributors that DuPerier contacted, including the Budweiser distributor, "either ignored [his] letters or turned [him] down because they had no interest in adding yet one more beverage to their product line."

On or about May 14, 1991, DuPerier contacted plaintiff via letter about Clearly Canadian. He was "interested in pursuing [plaintiff] as a distributor because [he] knew it was the Coors distributor and understood that it had been a well-established distributorship for many years." This letter proved successful, and on June 6, 1991, DuPerier met with Phil Hemby, plaintiff's General Manager, at the Columbus facility. According to DuPerier, the following occurred at that meeting:

> Phil Hemby and I discussed the mutual benefit of doing business together. By the conclusion of the meeting, [plaintiff] was my first choice for distributor in the three county Columbus territory. I did mention at that time that I was scheduled to see another distributor about handling the product, and Mr. Hemby indicated that he believed his company would be interested in doing the distribution and asked that I refrain from talking to anyone else until he had the opportunity to confirm with the principals of [plaintiff] that they wanted to carry the product.

At the time, DuPerier did not have a written contract with him, although he states that he discussed general matters with Hemby but "never suggested that [he] was covering all contract terms." At some point that same day, defendant sent plaintiff a contract, entitled "Sub-Distributor Agreement," via Federal Express. The next day, June 7, at 1:22 p.m., DuPerier telecopied to plaintiff exhibits to the contract setting forth plaintiff's territory and performance goals. At no time did anyone on plaintiff's behalf contact either DuPerier or defendant and object to any provision in the contract or the exhibits. Sometime thereafter, defendant received a fully executed copy of the contract signed by plaintiff's president, Sylvia Vaughan, and dated June 7, 1991.

Plaintiff's version of these events differs somewhat. Vaughan, who was not present at the meeting between DuPerier and Hemby, states that DuPerier offered plaintiff the opportunity to market and sell Clearly Canadian "subject to certain non-negotiable terms." Neither she nor Hemby (who did not submit an affidavit in this case) elaborates on what these terms were, nor does either point specifically at the forum selection clause as one

ments may not even be based on personal knowledge. The court is certainly capable of sifting through the affidavits and disregarding any matters which are inappropriate for its consideration, especially since such statements carry no weight with the court, without the necessity of engaging in the lengthy and time-consuming task

of guessing which statements in particular plaintiff wants stricken. The motion to strike is therefore denied.

**2.** Defendant had hired DuPerier's company for this purpose.

of the non-negotiable terms. Vaughan continues:

> Phil Hemby ... was told that either [plaintiff] accept the sub-distributor contract immediately, or DuPerier would award the Clearly Canadian franchise to a competing distributor. Hemby thereupon accepted the agreement on the terms offered by DuPerier.

> DuPerier did not make Phil Hemby aware of the intended inclusion of the forum selection clause.

Vaughan also states that the "sales figures and performance goals [were] unilaterally created by [defendant] ..." and, according to the complaint, were imposed on plaintiff after it had executed the agreement.

On December 19, 1991, defendant notified plaintiff that the contract was terminated effective immediately for failure to meet sales goals. The instant litigation thereafter ensued in this court.

### III.

The contract at issue is an eight and one-half page, single spaced document. It is printed in standard-sized type; there is no fine print. The portion of the contract which concerns the court here is found on page seven, Article XI, paragraph two:

> The construction, interpretation and performance of this Agreement and all transactions under it shall be governed by the laws of the State of Arizona, without giving effect to the conflict of law or choice of law rules thereof. Distributor [defendant] and Sub–Distributor [plaintiff] agree that any litigation related to this Agreement or transactions under it shall have the state or Federal courts located in the County of Maricopa, State of Arizona, as the proper venue, consent to the personal jurisdiction of the Arizona courts and agree to accept service of process in accordance with the Rules of Civil Procedure of the Arizona courts.

In the instant motion, defendant asks the court to enforce this forum selection clause and dismiss this action on the grounds that venue is improper. Although defendant requests dismissal "without prejudice to the right of plaintiff to pursue the lawsuit in Arizona if it so chooses," defendant has made no alternative motion to transfer. In response, plaintiff charges that because consent to this provision was obtained through unequal bargaining power, fraud, misrepresentation, and overreaching, it is unenforceable.

### DISCUSSION

Although forum selection clauses were originally disfavored by American courts, they are now considered "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972). "The enforcement of such a clause would be unreasonable if the clause is invalid for fraud or overreaching, or if forcing the resisting party to proceed in the [contractually] chosen forum would be so difficult for that party that it would effectively deprive it of its day in court." *Seattle–First National Bank v. Manges*, 900 F.2d 795, 799 (5th Cir.1990) (citing *M/S Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916). Although *M/S Bremen* was an admiralty case, its teachings have been applied in other contexts. *See, e.g., Manges*, 900 F.2d at 799; *In re Fireman's Fund Insurance Cos.*, 588 F.2d 93, 95 (5th Cir. 1979).

In the affidavit submitted by plaintiff's president, Ms. Vaughan makes general averments of lack of notice of the forum selection clause, fraud, unequal bargaining power, and over-reaching. The court finds these arguments unpersuasive for several reasons. First, Ms. Vaughan did not attend the negotiations between DuPerier and Hemby and thus has no personal knowledge of what transpired at that meeting. Second, although DuPerier hints that he may not have specifically mentioned the forum selection clause at his meeting with Hemby (after all, he did not have a contract with him), there is no evidence to suggest that defendant actively concealed its existence. The contract is less than nine pages long, none of it is written in fine print, and it is very straight forward. In no way did defendant prevent Ms. Vaughan from reading the contract or having her at-

torney read it before she signed it. Certainly, time was of the essence (the contract says as much), but it would have taken very little time for someone to have read this contract. If plaintiff found the forum selection clause objectionable, it could have sought negotiation on this point (plaintiff has never suggested that this was one of the allegedly non-negotiable terms), and, if defendant insisted on its insertion, then plaintiff could have rejected the contract.[3]

Third, by all accounts, plaintiff is a well established business and its president a savvy businesswoman; this is hardly a situation involving inexperience or naivety. Two companies sought to reach a mutually beneficial business arrangement. Either or both could have refused to accept the obligations contained in the proposed contract, and as indicated by the *M/S Bremen* Court, forum selection clauses are no longer unusual in this day of national and global business transactions. *See M/S Bremen*, 407 U.S. at 9, 92 S.Ct. at 1912 ("The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts"). Although defendant was anxious to find a distributor for its product and did, in all likelihood, tout Clearly Canadian as " 'the hottest thing going today,' " plaintiff was equally eager to embrace the opportunity to distribute the beverage. And finally, although plaintiff charges that defendant selected Arizona for its own convenience, "there is no indication that [defendant] set [Arizona] as the forum in which disputes were to be resolved as a means of discouraging [its sub-distributors] from pursuing legitimate claims." *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. ——, ——, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622, 633 (1991).

With regard to the inconvenience factor (on which plaintiff primarily focuses its attention), the court finds that requiring plaintiff to litigate this matter in the contractually chosen forum is not so "gravely difficult and inconvenient that [plaintiff] will for all practical purposes be deprived of [its] day in court." *M/S Bremen*, 407 U.S. at 18, 92 S.Ct. at 1917. The court recognizes that certain witnesses reside within this state and are therefore outside the subpoena power of the Arizona courts; however, the Federal Rules of Civil Procedure and the Federal Rules of Evidence have provisions to cover such circumstances. There is no reason to suggest either that defendant will be unable or unwilling to come to Mississippi to attend the depositions of these Mississippi witnesses, or that plaintiff will be unable to receive a fair hearing in Arizona by using these depositions, whether they be by transcription and/or video. *See id.* at 19, 92 S.Ct. at 1918. Certainly, it will be more inconvenient and expensive for plaintiff to litigate its claims in a venue other than this one. However, the inclusion of a forum selection clause does little more than shift these burdens from one party to the other, for it would certainly be inconvenient and costly to defendant to litigate various sub-distributor claims in numerous fora. According to the unrefuted affidavit of Michael Bennett, *see supra* note 3, these concerns, along with the desire to have a uniform interpretation of its agreements, lay at the heart of defendant's selection of Arizona, where its business is located, as the chosen forum for litigation. Cost and convenience were considerations which defendant weighed before contracting with plaintiff; plaintiff could have done likewise. The court does not believe that either factor is so prohibitive under the circumstances that plaintiff will be denied its day in court. This court is confident that the Arizona courts can

---

**3.** According to Michael Bennett, the treasurer and chief financial officer of Pure Beverage, Inc., defendant's general partner, it is not unusual for defendant's distributors or sub-distributors to use attorneys to negotiate contract terms. In Bennett's view, the instant forum selection clause was important, and

> [i]f [plaintiff] had resisted the forum selection clause, it is hard to say what the outcome would be. It would really depend on how

much each side felt it needed the other. If there were an alternative distributor in the territory who would agree to the clause ... we would be inclined to go with such distributor. If there were no satisfactory alternative to [plaintiff], we would have to consider modifying the clause or waiting to find a distributor (including [plaintiff]) who is both qualified and willing to abide by the clause.

288

fairly and objectively consider the testimony, documents, and relevant market factors, including "geographic, demographic and cultural issues," and reach a just decision.

Even if this court utilized an analysis based on 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought") and *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (forum selection clause is one factor in determining whether transfer to contractually chosen forum is in interest of justice), the court would reach a similar conclusion based, in part, on the analysis above. Here, though, no motion to transfer has been made and because the court is of the opinion that the forum selection clause should be enforced, this case is hereby dismissed without prejudice rather than transferred. *See generally Shute,* 499 U.S. at ——, 111 S.Ct. at 1528, 113 L.Ed.2d at 633 (court of appeals erred in refusing to enforce forum selection clause, i.e., summary judgment dismissal was appropriate).