692 A.2d 454

**Michael G. GILMAN**

v.

**WHEAT, FIRST SECURITIES, INC.**

**No. 53, Sept.Term, 1996.**

Court of Appeals of Maryland.

April 15, 1997.

Reconsideration Denied May 5, 1997.

Richard M. Meyer (Milberg Weiss Bershad Hynes & Lerach LLP; Mitch Kalcheim, New York City; John B. Isbister, Melissa G. Brault, Michael H. Tow, Tydings & Rosenberg LLP, Baltimore), on brief, for Appellant.

Jack E. McClard (Mark E. Herrmann, Hunton & Williams, Richmond, VA; John Jay Range, Michael P. McQuillen, Hunton & Williams, Washington, DC), on brief, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

Appellant, Michael Gilman, had a brokerage account with appellee, Wheat, First Securities, Inc. He filed a class action complaint in the Circuit Court for Montgomery County charging Wheat with violations of Maryland securities laws, breach of fiduciary duty, breach of contract, and conversion. The court dismissed the complaint based on a forum-selection clause in the contracts governing the brokerage account, which required that all actions arising under those contracts be conducted in a Federal or State court in Richmond, Virginia.

Gilman acknowledges the forum selection clause but contends that it should not be enforced because (1) his damages from the alleged misconduct of appellee are minuscule, (2) the only practical way he has of recovering his small loss is through a class action proceeding, and (3) such a proceeding is

not available to him in Federal court or in the Virginia State courts. We find no error and shall therefore affirm.

## I. *UNDERLYING FACTS*

Gilman is a Maryland resident. He is also an attorney and a member of the Virginia Bar and had previously been an instructor at a Virginia law school. Wheat is a securities brokerage firm. It is a Virginia corporation, headquartered in Richmond, but has offices in a number of States, including Maryland.

Gilman opened an account with Wheat at the latter's branch office in Bethesda, Maryland, in April, 1992. Two Securities Account Agreements were signed—one pertaining to a cash account, the other governing a margin account. Both contracts were signed by Gilman at Wheat's Bethesda office; they were then sent to Richmond, where they were accepted and signed by Wheat.

Each contract contained a choice-of-law clause stating that the agreement and all transactions made in the account were to be governed by Virginia law. More importantly, for purposes of this appeal, each agreement contained a prominently displayed dispute resolution provision, printed in capital letters. Under that provision, the parties agreed that all controversies arising between them concerning any transaction or concerning the construction, performance, or breach of the contract were to be determined by arbitration. Indeed, as part of that provision the parties acknowledged that they were "waiving their right to seek remedies in court, including the right to jury trial." The arbitration was to take place, at Gilman's election, before the New York Stock Exchange, Inc., the National Association of Security Dealers, Inc., or any other national securities exchange forum of which Wheat was a member and on which a transaction giving rise to the claim took place. The provision went on to set forth some of the preliminary procedures for the arbitration and ended with this statement:

"ANY JUDICIAL PROCEEDING RELATING TO THE ARBITRATION OR TO THIS AGREEMENT SHALL BE

CONDUCTED IN A STATE OR FEDERAL COURT IN RICHMOND, VIRGINIA AND I AGREE (A) TO SUBMIT TO THE JURISDICTION OF SUCH COURTS (B) THAT SUCH COURTS CONSTITUTE A CONVENIENT FORUM AND (C) THAT PROCESS MAY BE SERVED BY CERTIFIED MAIL RETURN RECEIPT REQUESTED AT MY LAST ADDRESS KNOWN TO YOU."

The record indicates that this provision is standard in Wheat's securities account agreements and is included in the agreements with each member of the class Gilman attempted to create. The record also indicates that all of Gilman's orders for the purchase or sale of securities on the account were executed by Wheat's trading desk in Richmond and that confirmations of those transactions were mailed to Gilman from Richmond. Records of the transactions are maintained at both the Richmond and Bethesda offices.

In May, 1994, Gilman filed a class action lawsuit against Wheat in the Supreme Court of New York, complaining about what has become known in the industry as order flow payments, *i.e.*, the practice of a broker routing customer buy and sell orders through a particular dealer, who compensates the broker for that business. The essence of the complaint, as characterized by Gilman, was that "in return for cash payments and other inducements, Wheat directed its customer orders, including those of the plaintiff, to market makers who paid Wheat ... kickbacks." The most common of those "kickbacks," according to Gilman, was the payment of two cents a share by the dealer to Wheat in return for Wheat's executing the customer's order with that dealer. He complained that Wheat kept the two cents and failed to disclose these "secret profits," although he acknowledged that Wheat did disclose, on the confirmation notices sent after the transaction, that it "receives remuneration on the transaction and that the source and amount of such remuneration would be disclosed upon request."

The class asserted by Gilman consisted of "all persons who maintain, or have maintained [since January 1, 1990] broker-

age accounts at Wheat and for whom Wheat executed transactions in securities with Wheat receiving kickbacks from the market makers with whom Wheat executed those transactions." He averred that there were several thousand such persons. Alleging that a broker engaged in such activity forfeits its right to compensation, Gilman sought not just the allegedly unlawful secret profits but the full amount of all commissions paid by the class members, along with punitive damages and attorneys' fees. Seven causes of action were pled: breach of a fiduciary relationship, commercial bribery in violation of § 180.05 of the New York Penal Law, fraud or deception in violation of art. 23–A of the New York General Business Law, breach of contract, common law fraud, conversion, and breach of fiduciary duty.

On November 30, 1994, the court dismissed the complaint on the ground that New York was an inconvenient forum. Without definitively resolving the validity of the forum-selection clause (much less the exclusivity of the arbitration provision) the court simply held that "the action lacks any connection to the New York forum chosen by plaintiff." Although an appeal was noted, it was not perfected.

In March, 1995, Gilman filed a similar class action lawsuit in the Circuit Court for Montgomery County. In contrast to the New York action, in which jurisdiction and venue were founded principally upon Wheat being a member of the New York Stock Exchange, in this action, he stressed the Maryland connections—his being a resident of the State, Wheat having an office and doing business here, the account being maintained in Bethesda, and the orders being placed at that office. The factual averments, however, were nearly identical to those stated in the New York action. Five causes were pled—two for fraud, in violation of Maryland Code, § 11–301 of the Corporations and Associations article, and one each for breach of fiduciary duty, breach of contract, and conversion. He sought as relief a declaratory judgment that Wheat had engaged in fraudulent and deceptive activities, an injunction to prohibit it from continuing to do so, and damages "in an amount as yet undetermined." In contrast to the relief sought

in the New York case, he did not seek the return of all commissions paid by the class members.

Wheat responded to the Maryland complaint by having it removed to the U.S. District Court, alleging both Federal question and diversity jurisdiction. That court found neither and therefore remanded the case back to the circuit court. *Gilman v. Wheat, First Securities, Inc.,* 896 F.Supp. 507 (D.Md.1995). The finding of no diversity jurisdiction was based, not on the residences of the parties, but on Gilman's failure to state a claim for at least $50,000 in damages. In that regard, and in clear contrast to both the relief sought in New York and the information report he filed in the circuit court pursuant to Maryland Rule 2–111(a), he did "not dispute that the actual damages claims are for one to two cents per share traded, amounting to a total of a few dollars per plaintiff." *Id.* at 510.[1] Judge Motz concluded that, even in a class action, the requisite amount in controversy "cannot be met by aggregating the separate claims of individual class plaintiffs." *Id.* at 509. Nor could the $50,000 threshold be met by the cost of injunctive relief to Wheat, as that cost also would be insignificant as to any one plaintiff. Federal question jurisdiction hinged on Wheat's assertion of Federal preemption, which Judge Motz rejected.

When the case returned to the circuit court, Wheat moved to dismiss the complaint on the grounds (1) of improper venue, based on the forum-selection clause in the two contracts, and (2) *res judicata,* based on the New York decision. With respect to the forum-selection clause, Wheat argued that the clause was valid, that there was no fraud or duress in its inclusion, that Gilman, as a Virginia lawyer, was aware of the clause and what it required, that Gilman did not have to deal with Wheat if he objected to that provision, and that the Virginia courts will afford him an appropriate remedy if he

---

1. In his information report, Gilman asserted that his tort claim involved more than $100,000 in damages and his breach of contract action involved damages of over $20,000. He also stated that no alternative dispute resolution process had been requested or tried, thereby effectively ignoring the arbitration provision in the two contracts.

proves his claim. The only ground for ignoring the clause asserted by Gilman was that Virginia did not have a class action procedure, which Wheat urged was an insufficient basis for not enforcing the clause.

Gilman argued in response that the class action procedure is in the nature of a remedy, one that is unavailable in Virginia.[2] The damages suffered by any one plaintiff, he claimed, were essentially minuscule—a few dollars—and that "[i]f he is going to recover $10.00, the only way to do it is through a class action." Wheat rejoined that Virginia has a procedure for resolving small claims and that it would not be necessary for Gilman even to have a lawyer in small claims court.

The court granted Wheat's motion, based on the forum-selection clause. It concluded that "parties ought to be bound by their agreements unless there is some fairly compelling reason that they shouldn't," and it did not regard the lack of a class action procedure in Virginia as such a compelling reason. Gilman appealed, arguing that (1) the forum-selection clause is "an inadequate basis for dismissal because it frustrates the public policy embodied in class actions and insulates the defendant from responsibility for its misconduct," and (2) Wheat had not sustained "its heavy burden of demonstrating that dismissal for improper venue is appropriate where jurisdiction is not lacking." We granted *certiorari* before proceedings in the Court of Special Appeals.

## II. *DISCUSSION*

### A. Order Flow Payments

■ The issue before us is not the legality of order flow payments but the enforceability of the forum-selection clause.

---

**2.** The case cited by Gilman in support of this contention is *Heirs of Roberts v. Coal Processing*, 235 Va. 556, 369 S.E.2d 188 (1988). That case does not *hold* that class actions are impermissible in Virginia, although it does state that proposition in *dicta*. Wheat has not challenged Gilman's contention, however, so, for the purposes of this appeal, we shall accept the statement that Gilman would not able to file the same type of class action he has filed in Maryland in a Virginia State court.

Nonetheless, at least for context, it is helpful to have some understanding of what the underlying case is about. As we indicated, order flow payments are those received by a broker for routing customer buy and sell orders through a particular wholesale dealer or other market maker. Relying in part on a public comment letter sent to the Securities and Exchange Commission by the New York Stock Exchange in December, 1993, Gilman obviously believes that the practice is heinous and unlawful.

The history of the practice and the limited regulation of it by the Securities and Exchange Commission were described in some detail by the New York Court of Appeals in *Guice v. Charles Schwab & Co., Inc.*, 89 N.Y.2d 31, 651 N.Y.S.2d 352, 674 N.E.2d 282 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1250, 137 L.Ed.2d 331 (1997). The court noted that the practice originated years ago in the over-the-counter (OTC) market but that, with advances in computer technology making possible an entirely automated market system independent of the floor of any stock exchange, and automated trading systems permitting accelerated execution of orders, OTC market makers and members of regional exchanges could compete for orders in listed stocks with the New York and American Stock Exchanges. Thus, it observed, "routing orders in listed stocks to OTC market makers and regional exchange specialists has more recently become a major source of order flow payments to retail broker-dealers." *Id.* at 354, 674 N.E.2d at 284 (footnote omitted).

The *Guice* Court recounted that the SEC had monitored and studied the practice for over a decade and, after conducting a round table discussion in 1989 and considering public comment to a proposed rule change in 1993, the Commission decided not to prohibit the practice but rather to require additional disclosure of it. At 287–88, the Court noted that, in adopting its final rule for regulating order flow payments in 1994,

"[the Commission] explained that it rejected elimination of order flow payments entirely because the practice did not necessarily violate a broker-dealer's best execution obli-

gation, and that the practice benefitted the securities industry in lowering execution costs, in facilitating technological advances in retail customer order handling practices and in enhancing competition among broker-dealers and the various exchange and nonexchange securities markets and, thus, also worked to the advantage of investors. . . . The SEC also noted the serious enforcement problems that elimination of the practice would entail and the drastic impact that an outright ban would have on the securities industry. . . ."

In its 1993 proposed amendment to Rule 10b–10, the SEC would have required brokers to disclose on their confirmation statements the specific dollar amount of any order flow payment received for that transaction, but it retreated from that position in the final 1994 rule, being "apprehensive that mandatory disclosure of specific monetary receipts might be 'unworkable' . . . and would, at the least, impose 'an extreme burden' upon broker-dealers 'to determine the amount of order flow received for each order in time for a confirmation' and would entail expenses disproportionately high in relation to the potential benefits to customers. . . ." *Id.* at 358, 674 N.E.2d at 288 (quoting in part from Payment For Order Flow, Securities and Exchange Release No. 34–34902 [Oct. 27, 1994], reprinted in 59 Fed.Reg. 55006, 55010 n. 39).

*See also Orman v. Charles Schwab & Company, Inc.,* 285 Ill.App.3d 937, 221 Ill.Dec. 720, 721, 676 N.E.2d 241, 242 (1996), noting as well that order flow payments are "a recognized and widespread practice in the industry and part of the competitive market."

## B. The Forum–Selection Clause

There have been a plethora of cases involving the validity and enforceability of forum-selection clauses. This Court has considered the issue, directly, only once, in *Stockley v. Thomas,* 89 Md. 663, 43 A. 766 (1899). The action there was to have a Maryland receiver appointed for an insolvent Pennsylvania insurance company that was already under receivership in Pennsylvania. The plaintiff's horse was insured by the company, and, when the horse had to be destroyed and the company

did not pay the claim, the plaintiff succeeded in having a Maryland court appoint a Maryland receiver to take charge of the company's assets in this State, to collect debts due the company within the State, and to pay the claims of Maryland creditors. The Pennsylvania receiver appealed.

This Court reversed. Our first concern was with the fact that there was no practical way in which a Maryland receiver could carry out his duties. The only source of funds for the payment of claims under the policy was assessments made against policyholders, and a Maryland receiver would have no ability to make such assessments. All of the information that would be necessary to make the assessments was in Pennsylvania. We noted, further, that the making of assessments would require the court to assume the management of the internal affairs of a foreign corporation, which, we held, was beyond its jurisdiction. Finally, we noted that the policy upon which the claim was based required that any action brought against the company be filed in Philadelphia, which was where the records were kept, the company was headquartered, and the policies were issued. For all of those reasons, "and especially in the absence of any allegation to show that the Court selected by the agreement of the parties is not able and willing to afford full relief," we found "no good reason" why the complaint "should, even if it could, be entertained by a Court of this State." *Id.* at 668–69, 43 A. at 768.

At least since 1972, most of the discussion regarding the enforceability of forum-selection clauses has centered around two cases decided by the United States Supreme Court, and we shall therefore commence our discussion with those cases.

In *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the Court held enforceable a forum-selection clause in an international towage contract. The agreement called for a German company, Unterweser, to tow an oceangoing drilling rig owned by an American company, Zapata, from Louisiana to Ravenna, Italy. The contract contained one clause exculpating Unterweser from liability for damages to the rig and another providing that "[a]ny dispute

arising must be treated before the London Court of Justice." While the rig was under tow in international waters in the Gulf of Mexico, a storm arose and the rig was damaged. At Zapata's direction, Unterweser's tug, the *Bremen,* towed the rig to Tampa, Florida, the nearest port of refuge. 407 U.S. at 2–3, 92 S.Ct. at 1909–10, 32 L.Ed.2d at 516–17.

In derogation of the forum-selection clause, Zapata filed suit in Federal court in Tampa, seeking *in personam* damages against Unterweser and *in rem* damages against the *Bremen.* Unterweser filed its own action, for breach of the towing contract, in the High Court of Justice in London and moved to dismiss Zapata's American action on both jurisdictional and *forum non conveniens* grounds. Zapata moved to dismiss the English action. The English court acted first, rejecting Zapata's jurisdictional challenge and holding that the forum-selection clause conferred jurisdiction.

The District Court eventually denied Unterweser's motion to dismiss. Following the ruling in *Carbon Black Export, Inc. v. The Monrosa,* 254 F.2d 297, 300–01 (5th Cir.1958), *cert. dismissed,* 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723 (1959), that "agreements in advance of controversy whose object is to oust the jurisdiction of the courts are contrary to public policy and will not be enforced[,]" the court gave little or no weight to the forum-selection clause. It then decided, under normal *forum non conveniens* principles, that the plaintiff's choice of forum should not be disturbed unless the balance was strongly in favor of the defendant and that such was not the case. A divided Court of Appeals for the Fifth Circuit affirmed, noting, among other things, that the casualty occurred in close proximity to the District Court, Zapata was an American citizen, England had no interest in or contact with the controversy, other than the forum-selection clause, and that England would enforce the exculpation clause which, under American law, was unenforceable as being against public policy. *In re Unterweser Reederei, Gmbh,* 428 F.2d 888 (5th Cir.1970), *aff'd en banc,* 446 F.2d 907 (5th Cir.1971).

The Supreme Court reversed. Acknowledging that forum-selection clauses had historically not been favored by American courts and had often been declared unenforceable as being against public policy, the Court concluded that the better view was that such clauses "should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." 407 U.S. at 10, 92 S.Ct. at 1913, 32 L.Ed.2d at 520. That view, it said, was simply "the other side" of the proposition recognized in *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315, 84 S.Ct. 411, 414, 11 L.Ed.2d 354, 357 (1964), that "parties to a contract may agree in advance to submit to the jurisdiction of a given court," that it was substantially followed in other common law countries, that it was the view adopted by the Restatement (Second) of Conflict of Laws,[3] that it was in accord with "ancient precepts of freedom of contract," and that it reflected an appreciation of the "expanding horizons of American contractors who seek business in all parts of the world." 407 U.S. at 11, 92 S.Ct. at 1914, 32 L.Ed.2d at 521.

The Court dismissed the argument that forum-selection clauses are improper because they tend to oust a court of jurisdiction as "hardly more than a vestigial legal fiction." *Id.* at 12, 92 S.Ct. at 1914, 32 L.Ed.2d at 521. The clause did not divest the American court of jurisdiction but rather put the question of whether the court "should have exercised its jurisdiction to do more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement, by specifically enforcing the forum clause." *Id.,* 407 U.S. at 12, 92 S.Ct. at 1914, 32 L.Ed.2d at 521–22. In light of current commercial realities and expanding international trade, the Court concluded that "the forum clause should control absent a strong showing that it should be set aside" and that the burden was on Zapata to show clearly "that enforcement would be unreasonable or unjust, or that

---

**3.** The RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 80 (1969) states: "The parties' agreement as to the place of the action cannot oust a state of judicial jurisdiction, but such an agreement will be given effect unless it is unfair or unreasonable."

the clause was invalid for such reasons as fraud or over-reaching." *Id.* at 15, 92 S.Ct. at 1916, 32 L.Ed.2d at 523.

The Court found no such reasons in that case. It agreed that a forum clause would be unenforceable if enforcement "would contravene a strong public policy of the forum in which the suit is brought, whether declared by statute or by judicial decision" but held that even the willingness of the English court to enforce an exculpation clause that the Supreme Court, in a case involving domestic commerce, had itself refused to enforce was not sufficient. *Id.* at 15–16, 92 S.Ct. at 1916–17, 32 L.Ed.2d at 524–25 (citations omitted). The Court acknowledged as well that a forum clause, even one freely bargained for that did not contravene important public policy, may be unreasonable and unenforceable "if the chosen forum is *seriously* inconvenient for the trial of the action" but immediately noted that, where the parties to a private international commercial agreement contemplated the claimed inconvenience, "it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable." *Id.* at 16, 92 S.Ct. at 1916–17, 32 L.Ed.2d at 524 (emphasis in original). In that regard, the Court observed that it was not dealing with an agreement between two Americans to resolve their local disputes "in a remote alien forum," the serious inconvenience of which in that circumstance might carry greater weight in determining the reasonableness of the clause. Noting that any inconvenience Zapata might suffer from having to litigate in London was clearly foreseeable at the time of contracting, it held:

> "In such circumstances, it should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain."

*Id.* at 18, 92 S.Ct. at 1917, 32 L.Ed.2d at 525.

There is no doubt that *The Bremen* had a profound effect on the way in which courts viewed forum-selection clauses. After

1972, the literature abounds with decisions, from both Federal and State courts, declaring such clauses valid, putting the burden on the party resisting the clause to show that it is unreasonable, and ultimately enforcing the clauses. *See,* for example, *Sterling Forest Associates, Ltd. v. Barnett–Range Corp.,* 840 F.2d 249 (4th Cir.1988) and cases cited at 251, *rev'd on other grounds,* 490 U.S. 495, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989); *Fireman's Fund Amer. Ins. Cos. v. Puerto Rican For. Co., Inc.,* 492 F.2d 1294 (1st Cir.1974); *Medical Legal Consulting Service v. Covarrubias,* 648 F.Supp. 153 (D.Md. 1986); *Smith, Valentino & Smith, Inc. v. Superior Ct. of L.A. Cty.,* 17 Cal.3d 491, 131 Cal.Rptr. 374, 551 P.2d 1206 (1976); *ABC Mobile Systems, Inc. v. Harvey,* 701 P.2d 137 (Colo.Ct. App.1985); *Paul Business Systems v. Canon U.S.A.,* 240 Va. 337, 397 S.E.2d 804 (1990). One annotator summarized the "modern view" triggered by *The Bremen* as follows:

> "Where no additional expense is created, the witnesses are available at either location, the party will not lose his remedy, and the provision was freely bargained for, the courts have declined jurisdiction and enforced the contract.... On the other hand, where the party seeking to avoid the clause has satisfied his burden of proof and shown that enforcement of the clause will cause undue hardship or has not been freely bargained for, the courts have refused to enforce it."

Francis M. Dougherty, Annotation, *Validity of Contractual Provision Limiting Place or Court in Which Action May Be Brought,* 31 A.L.R.4th 404, 409 (1984).

The Supreme Court revisited *The Bremen* in *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991), in which it further eroded objections to enforcing forum-selection clauses on the ground of inconvenience and actually dismissed, as a basis for rejecting such a clause, the fact that it was not freely bargained for but was included routinely in a form contract.

The Shutes, residents of the State of Washington, purchased passage for a cruise from Los Angeles to Puerto

Vallarta, Mexico, on Carnival's ship, the *Tropicale*. Carnival was headquartered in Florida. The tickets, purchased through an agent in Washington, were sent to the Shutes from Florida. On the reverse side of each ticket was a clause requiring that "all disputes and matters whatsoever arising under, in connection with or incident to this Contract shall be litigated, if at all, in and before a Court located in the State of Florida, U.S.A., to the exclusion of the Courts of any other state or country." At the Supreme Court level, the Shutes essentially conceded that the clause was reasonably communicated to them and that they were aware of its incorporation into the contract.

While at sea in international waters off the coast of Mexico, Mrs. Shute was injured when she slipped on a deck mat. Claiming negligence on the part of Carnival, she filed suit against the company in a U.S. District Court in Washington. Carnival moved to dismiss on the alternative grounds of the forum-selection clause and insufficient contacts with Washington to support *in personam* jurisdiction. The District Court granted the motion on the due process ground. The Ninth Circuit Court of Appeals reversed, finding that there was sufficient contact to support jurisdiction and that the forum-selection clause was unenforceable because (1) it was not freely bargained for, and (2) as the Shutes were physically and financially incapable of pursuing the litigation in Florida, to enforce the clause would effectively deprive them of their day in court.

As in *The Bremen*, the Supreme Court reversed. Although it recognized that *The Bremen* was an unusual case, it made clear that the principles laid down there apply as well to the more routine situations. The fact that the clause was not freely bargained for, that it was "purely routine and doubtless nearly identical to every commercial passage contract issued by petitioner and most other cruise lines" and that "the individual purchasing the ticket will not have bargaining parity with the cruise line" did not render the clause unenforceable. *Id.* at 593, 111 S.Ct. at 1527, 113 L.Ed.2d at 631. The Court noted several good reasons for including such a clause in a

form contract. Given that the cruise line carried passengers from many different locales, it faced the prospect of litigation in several different fora and had a legitimate interest in limiting the potential fora. Additionally, such a clause "has the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended, sparing litigants the time and expense of pretrial motions to determine the correct forum and conserving judicial resources that otherwise would be devoted to deciding those motions." *Id.* at 594, 111 S.Ct. at 1527, 113 L.Ed.2d at 632. Finally, it suggested that the savings realized by limiting the fora would result in lower fares, thereby benefiting the passengers.

The Court also rejected the appellate court's conclusion that the clause was unenforceable because of the hardship to the Shutes of litigating in Florida. Florida was not a "remote alien forum," and, because the Shutes did not claim lack of notice of the clause, the Court held that they had "not satisfied the 'heavy burden of proof' ... required to set aside the clause on grounds of inconvenience." *Id.* at 595, 111 S.Ct. at 1528, 113 L.Ed.2d at 633 (quoting *The Bremen* ). The Court made clear that forum-selection clauses in form contracts remain subject to judicial scrutiny for fundamental fairness but concluded that there was no indication in that case that Carnival chose Florida as a forum as a means of discouraging passengers from pursuing legitimate claims. It noted the close connections Carnival had to Florida, being headquartered there and having many of its cruises depart from and return to Florida ports. Nor was there any evidence that it obtained acquiescence in that clause by fraud or overreaching.

Although *The Bremen* and *Carnival* constitute the major recent expositions from the Supreme Court on forum-selection clauses, that Court has confirmed the validity and utility of such clauses in a number of other cases as well. *See Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270, 280–81, *reh'g denied,* 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974) (enforcing an arbitration clause as "a specialized kind of forum-selection clause...."); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,* 473 U.S. 614, 631,

105 S.Ct. 3346, 3356, 87 L.Ed.2d 444, 458 (1985) (*"The Bremen and Scherk* establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions[ ]"); *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29–31, 108 S.Ct. 2239, 2243–45, 101 L.Ed.2d 22, 31–33 (1988) (forum-selection clause a significant factor in determination whether District Court should transfer case under 28 U.S.C. § 1404(a)); and *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* —— U.S. ——, ——, 115 S.Ct. 2322, 2328, 132 L.Ed.2d 462, 474 (1995).

We distill from these pronouncements, as have most courts, especially since 1992, that (1) a forum-selection clause is presumptively valid and enforceable and the party resisting it has the burden of demonstrating that it is unreasonable, (2) a court may deny enforcement of such a clause upon a clear showing that, in the particular circumstance, enforcement would be unreasonable, and (3) the clause may be found to be unreasonable if (i) it was induced by fraud or overreaching, (ii) the contractually selected forum is so unfair and inconvenient as, for all practical purposes, to deprive the plaintiff of a remedy or of its day in court, or (iii) enforcement would contravene a strong public policy of the State where the action is filed. *See Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7 (2d Cir.1995); *Allen v. Lloyd's of London*, 94 F.3d 923 (4th Cir.1996); *Kevlin Services, Inc. v. Lexington State Bank*, 46 F.3d 13 (5th Cir.1995); *Bonny v. Society of Lloyd's*, 3 F.3d 156 (7th Cir.1993), *cert. denied*, 510 U.S. 1113, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994); *Excell, Inc. v. Sterling Boiler & Mechanical, Inc.*, 106 F.3d 318 (10th Cir.1997); *Stereo Gema, Inc. v. Magnadyne Corp.*, 941 F.Supp. 271 (D.P.R.1996); *Haskel v. FPR Registry, Inc.*, 862 F.Supp. 909 (E.D.N.Y.1994); *Cambridge Nutrition A.G. v. Fotheringham*, 840 F.Supp. 299 (S.D.N.Y.1994); *Hunter Distributing Co., Inc. v. Pure Beverage Partners*, 820 F.Supp. 284 (N.D.Miss.1993); *Dace Intern., Inc. v. Apple Computer, Inc.*, 275 Ill.App.3d 234, 211 Ill.Dec. 591, 655 N.E.2d 974, *cert. denied*, 164 Ill.2d 560, 214 Ill.Dec. 318, 660 N.E.2d 1267 (1995); *Vanier v. Ponsoldt*, 251 Kan. 88, 833 P.2d 949 (1992); *Wilfred MacDonald v. Cushman*, 256

N.J.Super. 58, 606 A.2d 407 (App.Div.), *cert. denied,* 130 N.J. 17, 611 A.2d 655 (1992).

There have been cases, even since *Carnival,* in which forum-selection clauses have not been enforced, but only in compelling circumstances. *See,* for example, *Kubis & Perszyk v. Sun Microsystems,* 146 N.J. 176, 680 A.2d 618 (1996), holding that enforcement of a forum-selection clause in a franchise agreement would contravene protections afforded by a New Jersey statute; and *Prows v. Pinpoint Retail Systems, Inc.,* 868 P.2d 809 (Utah 1993), declining to enforce a forum-selection clause where, to do so, would have required the plaintiff to litigate in two separate States and the selected forum had no contact with either the parties or the contract.

## C. Analysis

■ There is no indication that the forum-selection clause in this case was induced by fraud or overreaching. As noted, the clause was prominently displayed in the contracts, being all in capital letters, and there is no suggestion that Gilman was unaware of its existence or its meaning. He was not obliged to deal with Wheat if he objected to the clause.

Nor has Gilman offered any evidence, other than the unavailability of a class action procedure, to suggest any significant inconvenience in litigating his case in a Virginia court in Richmond.[4] Virginia is hardly a "remote alien forum," especially to a Virginia lawyer, a former instructor at a Virginia law school. Richmond is less than 150 miles from Gilman's home; most, if not all, of the relevant documents pertaining to the account and to the transactions on it are in Richmond, even if some of them may also be in Maryland; and relevant information, both documentary and testimonial, pertaining to any agreements concerning order flow payments is much more likely to be in Richmond than in Maryland.

---

4. Based upon the ruling of Judge Motz, it would appear that, due to the inability to aggregate the damage claims of class members, Gilman would be unable to state a claim in any Federal court in Richmond. As a practical matter, therefore, the only forum available to him would be the appropriate Virginia State court.

Just as there was good reason for Carnival Cruise Lines to select Florida as the chosen forum, there was good reason for Wheat to select Virginia. It is headquartered in that State. The agreements called for the substantive law of Virginia to apply and, notwithstanding that Virginia law could be applied by any court, it is not unreasonable to assume that the Virginia courts would be most familiar with it. That might have been a particular benefit with respect to the arbitration provision. States vary somewhat in their attitude toward broad arbitration clauses, and Wheat may well have desired that disputes over that provision in particular or over any arbitral awards rendered pursuant to it be dealt with in the Virginia courts.

Finally, other than the fact that Maryland allows class action suits and Virginia allegedly does not, Gilman has failed to identify any strong public policy of Maryland that would be violated by enforcing the clause. There is no suggestion that the substantive law of Virginia, as to the actions pled by Gilman, is significantly different from that of Maryland. Maryland does have a public policy with respect to class actions. By rule, it permits such actions (*see* Md. Rule 2–231), and, by statute, it allows the separate claims of class action plaintiffs to be aggregated in order to meet the $2500 jurisdictional threshold of the circuit courts. *See* Md.Code, § 4–402(d) of the Courts and Judicial Proceedings article. The public policy does not extend any further, however. Maryland law does not mandate such actions; it does not require that a plaintiff who *could* file such an action do so, in lieu of pursuing an individual action or joining with other persons as individual co-plaintiffs.

The only question, then, is whether the alleged unavailability of a class action procedure in a Virginia court effectively deprives Gilman of a remedy and, for that reason, makes the otherwise valid forum-selection clause so unreasonable as to be unenforceable. In this regard, the parties squabble over whether a class action procedure constitutes a "remedy" or merely a procedural device. Clearly, the authorization to file class actions, as opposed to having multiple individual plaintiffs join in an action, is a procedural mechanism and has been

so characterized. *See Rank v. Krug,* 90 F.Supp. 773 (N.D.Cal. 1950); *Austin v. Pennsylvania,* 876 F.Supp. 1437 (E.D.Pa. 1995); 3B *Moore's Federal Practice* ¶¶ 23.01[1] through 23.02– 1 (1996). Unlike the mechanisms of money damages, or injunctions, or orders of sequestration, it is not a "remedy" *per se,* in the sense that it affords, on its own, a form of relief for a particular cause of action. It does, however, contain a penumbral remedial aspect to the extent that, by overcoming procedural or economic impediments that might hinder a normal action, it may make relief that otherwise might be only potentially available to a plaintiff actually available.

The issue of whether the forum-selection clause at issue here should be enforced should not depend upon what label we attach to the class action mechanism, however. The reasonableness of the clause needs to be judged on a substantive, not a formalistic or pedantic basis.

We are unaware of any case—and none has been cited to us—in which the unavailability of a class action procedure, either generically or in a particular case, has been regarded as sufficient to render an otherwise valid forum-selection clause unenforceable. Without necessarily endorsing the result, we note that, in a related context, courts have enforced forum-selection clauses in the face of arguments that the chosen forum would not provide a remedy because its statute of limitations had run (*General Elec. Co. v. G. Siempelkamp GmbH & Co.,* 809 F.Supp. 1306 (S.D.Ohio 1993)), or because it did not allow for a jury trial, its judicial process was slow, trial by depositions was not permitted, and that it required large monetary payments as security for a potential judgment (*Interamerican Trade v. Companhia Fabricadora,* 973 F.2d 487 (6th Cir.1992)).

Gilman does not dispute that he could lawfully bring an action in a Virginia court for injunctive relief as to his claim of securities fraud and to recover damages for that claim and for his additional claims of breach of contract, breach of fiduciary duty, and conversion. Remedies for those causes of action *are* available to him in Virginia. His only point is that, because

his personal loss is so insignificant, it is impractical for him to bring an individual action and thus, if he cannot bring a class action, he will be unable to recover the $10 or so that he claims to have lost.

That is not the kind of deficiency that will ordinarily warrant ignoring a contractual forum-selection clause, especially the kind of clause now before us. It is important to recall once again that the clause in question was part of an arbitration agreement, under which Gilman agreed to arbitrate any disputes he had with Wheat arising from the account, that, under that clause, he expressly waived his right "to seek remedies in court, including the right of jury trial," and that he had a choice of fora in which to conduct the arbitration. Although, as was pointed out to us in Gilman's motion for reconsideration, the agreement exempts class action suits from the arbitration requirement, the forum-selection clause with respect to judicial proceedings was a part of the arbitration clause — it is not stated as a separate provision — and should, therefore, be read in the context of the arbitration remedy. When so read, it is reasonable to suppose that any judicial proceedings envisioned by the parties, more likely than not, would be proceedings to compel arbitration or to enforce an arbitral award. Accordingly, when looking at the clause in the context of the parties' probable expectations, it would not seem that the unavailability of a class action procedure in Virginia was of much importance. If Gilman, an experienced Virginia lawyer presumably aware of Virginia's apparent non-recognition of the class action procedure, believed otherwise — if he anticipated using or desired to keep in reserve that procedure — why did he sign the agreement?

We align ourselves with the view of forum-selection clauses reflected in *Stockley v. Thomas, supra,* 89 Md. 663, 43 A. 766, as articulated in § 80 of the Restatement—that such a clause ordinarily will be enforced "unless it is unfair or unreasonable"—and, applying the principles embodied in that view, we hold that the clause at issue here is not unreasonable and should be enforced. For that reason, we need not consider

Wheat's *res judicata* argument and affirm the judgment of the circuit court.

**JUDGMENT AFFIRMED;**

**APPELLANT TO PAY THE COSTS.**